**HIGH TECH GAYS; Timothy Dooling; Joel Crawford; Robert Weston; and all others similarly situated, Plaintiffs,**

**v.**

**DEFENSE INDUSTRIAL SECURITY CLEARANCE OFFICE; Director of Defense Industrial Security Clearance (now G.M. Crane); Defense Investigative Service: Director of Defense Investigative Service (now Thomas J. O'Brien); and Secretary of Defense (now Caspar Weinberger), Defendants.**

No. C 84–6078 TEH.

United States District Court, N.D. California.

Aug. 19, 1987.

Richard Gayer, San Francisco, Cal., for plaintiffs.

Joseph Russoniello, U.S. Atty., Stephen Schirle, Asst. U.S. Atty., San Francisco, Cal., for defendants.

## ORDER

THELTON E. HENDERSON, District Judge.

This case is a nationwide class action challenging the Department of Defense's policy of subjecting lesbian and gay applicants for Secret and Top Secret industrial security clearances to expanded investigations and mandatory adjudications because they are lesbian or gay.[1] The case requires the Court to decide whether the United States Constitution permits the Department of Defense, in the interest of national security, to subject citizens to expanded investigations because they seek and engage in emotional, affectional, and sexual

---

1. Throughout this Order, the terms "lesbians and gay men," "gay people," and "homosexuals" are used synonymously and the terms "straight people" and "heterosexuals" are used synonymously.

relationships with people of their own sex. The matter is presently before the Court on plaintiffs' and defendants' cross-motions for summary judgment. After careful consideration of the record and the papers submitted in the matter and after hearing oral argument of the parties, the Court hereby grants in part and denies in part plaintiffs' motion for summary judgment and grants in part and denies in part defendants' motion for summary judgment.

*Procedures for Evaluating Security Clearances*

The purpose of the Department of Defense's policies and procedures concerning security clearances is to determine which persons employed in defense-related positions should be granted access to classified information. The Department of Defense Personnel Security Program Regulation, DoD 5220.2–R, Jan. 1, 1987, 32 C.F.R. § 154 (1987), and the Department of Defense Industrial Personnel Security Clearance Review Program, DoD 5220.6, Aug. 12, 1985, set forth the procedures, standards, and criteria which govern applications for Secret and Top Secret clearances. When a person applies for either a Secret or Top Secret clearance he must first submit a personal security questionnaire to the Defense Industrial Security Clearance Organization (hereinafter "DISCO"). For a Secret clearance, DISCO then conducts a National Agency Check (hereinafter "NAC"). An NAC consists of a record check of designated agencies of the federal government, generally the Federal Bureau of Investigation and the Defense Central Intelligence Index. For a Top Secret clearance, the Defense Investigative Service (hereinafter "DIS") completes a Background Investigation for each applicant. A Background Investigation consists of an NAC, checks on local records, and interviews with potentially knowledgeable personal sources.

For an application for a Secret clearance, DISCO will grant the clearance if no adverse or questionable information is developed after the NAC. If adverse or questionable information arises from the questionaire or the NAC, DIS conducts an expanded investigation to the extent necessary to substantiate or disprove the adverse or questionable information. In addition, DIS conducts a personal interview of the applicant to resolve the potentially adverse information. If information obtained from the expanded investigation resolves the question of potentially adverse information, DISCO grants the Secret clearance. Similarly, for a Top Secret clearance application, if the Background Investigation resolves any potentially derogatory information that may have arisen during the investigation, DISCO grants the clearance. The Department of Defense Personnel Security Program, DoD 5200.2–R, App. E, 32 C.F.R. § 154, App. D (1987), provides guidelines for DISCO to determine that there is significant adverse information that would prevent DISCO from granting the clearance.

For both Secret and Top Secret clearances, if DISCO cannot resolve the difficulty and thus cannot find that granting the security clearance would be clearly consistent with the national interest, the case is referred to the Directorate for Industrial Security Clearance Review (hereinafter "DISCR") for review and adjudication with a statement explaining the basis for the referral. Upon referral from DISCO, DISCR evaluates the application under the standards and criteria set forth in DoD 5200.2–R and DoD 5220.6 and determines whether or not to grant a clearance. The criteria for determining eligibility for a clearance includes, but is not limited to, seventeen categories listed in DoD 5200.2–R, II–1–II–3, 32 C.F.R. § 154.7 (1987) and further explicated in DoD 5200.2–R, App. I, 32 C.F.R. § 154, App. H (1987). If DISCR denies the clearance, the applicant is entitled to a written statement of reasons, an opportunity to reply in writing to those reasons and a hearing at which she can be represented by counsel and have an opportunity to cross-examine witnesses.[2] Final-

---

**2.** This procedure differs slightly from the old procedure under which the Defense Department evaluated named plaintiffs Dooling's and Craw-

ford's applications for security clearances. Under the old system, DISCO acted as a first level adjudicator of security clearance determina-

ly, the Department of Defense through the Defense Central Index of Investigations maintains a record of whether DIS conducted an investigation of the applicant.

*Differential Treatment of Homosexual and Heterosexual Applicants*

The Department of Defense treats gay people differently than straight people in its determination of whether an applicant should receive either a Secret or Top Secret clearance. First, for Secret clearances, the Defense Department subjects all lesbian and gay applicants for clearances to expanded investigations to which it does not subject straight applicants. DISCO considers the fact that an applicant is gay, assuming there was homosexual activity within the last fifteen years, to be "information of a derogatory nature" that would result in DISCO's conducting an expanded investigation of the applicant. This expanded investigation typically results in a two and one-half month delay in DISCO's processing of the applicant's case. All applicants who apply for Secret clearance must undergo the NAC, which takes 60–65 days or approximately two months. If the applicant is gay, the expanded investigation takes another 70–75 days or approximately another two and one-half months, resulting in a total investigation time of 135–140 days or approximately four and one-half months.

The policy basis for these expanded investigations is set forth in the DIS investigation manual. DIS Manual for Personnel Security Investigations, DIS 20–1–M, July 1985, provides staff direction, operational and investigative policy, and procedural guidance for conducting personnel security investigations of applicants. DIS subjects lesbian and gay applicants to different types of investigation than it does straight applicants. DIS does not generally investigate straight applicants with respect to sexual behavior; however, it subjects all

lesbian and gay applicants to investigations. The manual states that "[n]ormally DIS does not investigate allegations of heterosexual conduct between consenting adults." DIS will investigate heterosexual behavior only if it shows that the person is susceptible to coercion and blackmail, that the person has committed a criminal act, or that the person has engaged in "reckless and irresponsible conduct." DIS 20–1–M at 4–5.

However, all homosexual activity is subject to investigation. The manual states that "[s]exual conduct can be a relevant consideration in circumstances in which deviant conduct indicates a personality disorder or could result in exposing the individual to direct or indirect blackmail or coercion." The manual states that "such behavior includes homosexuality ..." Describing behavior that is "deviant sexual conduct," the manual lists homosexuality along with bestiality, fetishism, exhibitionism, necrophilia, nymphomania or satyriasis, masochism, sadism, pedophilia, transvestism, and voyeurism. The manual simply uses the term homosexuality as a general term that encompasses all types of homosexual experience and would include a long-term affectional, emotional, and sexual relationship between two openly gay people or a simple, casual dating relationship between two openly gay people. The manual describes homosexuality as "sexual misconduct" and "aberrant sexual behavior" and states that participation in such "deviant sexual activities" may tend to "cast doubt on the individual's morality, emotional or mental stability and may raise questions as to his or her susceptibility to coercion or blackmail." DIS 20–1–M at 4–5.

Second, for both Secret and Top Secret clearances, DISCO refers all cases of lesbian or gay applicants to DISCR for adjudi-

tions. DISCO would review and evaluate the investigative file. If DISCO determined that granting the clearance was consistent with national security, it would grant the clearance. If DISCO determined that granting the clearance was not consistent with the national interest, DISCO would recommend to DISCR that the clearance be denied, suspended, or revoked.

Under the current system, DISCO makes no such determination and recommendation. If DISCO uncovers no unresolvable derogatory information, it grants the clearance. However, if DISCO uncovers derogatory information it cannot resolve, it forwards the case to DISCR without making a further evaluation or recommendation to DISCR.

cation while it does not do so for straight applicants. For Secret clearances, DISCO refers applications of lesbians and gay men to DISCR for adjudication because DISCO does not consider "derogatory" information of homosexuality to be resolvable. For Top Secret clearances, although all applicants must undergo Background Investigations, DISCO refers all cases of lesbian or gay applicants to DISCR for adjudication because it considers information regarding homosexuality to be potentially significant adverse information that requires further adjudication.

The basis for DISCO's referring all applications of lesbians and gay men for Top Secret clearances to DISCR for adjudication is set forth in DoD 5200.2–R, App. E, 32 C.F.R. § 154, App. D. (1987). This appendix provides standards for DISCO to follow to determine whether the Background Investigation for a Top Secret applicant contains significant adverse information that requires referral to DISCR. The standards incorporate the adjudicative criteria and guidelines discussed below. *See* DoD 5200.2–R, II–1–II–3, App. I; 32 C.F.R. § 154.7, App. H (1987). In addition, the standards state that "all indications of moral turpitude" and "aberrant, deviant, or bizarre sexual conduct or behavior" constitute significant adverse information. DoD 5200.2–R, App. E, 32 C.F.R. § 154, App. D (1987).

Defendants' application of the criteria upon which they base their determination of an applicant's elgibility for a security clearance results in differential treatment of gay and straight applicants. It is defendants' position that six of the criteria that defendants use to determine eligibility for a security clearance may apply to all cases involving homosexual applicants but do not necessarily apply in general to cases involving heterosexual applicants. According to defendants, homosexuality may constitute any of the six following factors that could render a lesbian or gay applicant unfit for a security clearance:

"g. Disregard of public law, Statutes, Executive Orders of Regulations including violation of security regulations or practices."

"h. Criminal or dishonest conduct."

"i. Acts of ommission or commission that indicate poor judgment, unreliability or untrustworthiness."

"j. Any behavior or illness, including any mental condition, which, in the opinion of competent medical authority, may cause a defect in judgment or reliability with due regard to the transient or continuing effect of the illness and the medical findings in such case.

"k. Vulnerability to coercion, influence or pressure that may cause conduct contrary to the national interest ..."

"q. Acts of sexual misconduct or perversion indicative of moral turpitude, poor judgment, or lack of regard for the laws of society."

DoD 5200.2–R, II–1–II–3, 32 C.F.R. § 154.7 (1987).

The Department of Defense Personnel Security Program Regulation, DoD 5200.2–R, App. I, 32 C.F.R. § 154, App. H (1987), sets forth an adjudication policy that elaborates on these criteria in order to assist adjudicators in making security clearance decisions. With respect to criteria "k" above, the policy explains what may constitute "Foreign Connections/Vulnerability to Blackmail or Coercion." The policy lists as a disqualifying factor the fact that an applicant has concealed or attempted to conceal his homosexuality from his employer or from his immediate family members, close associates, supervisors, or coworkers. The policy states: "Conduct or actions by the individual that increase the individual's vulnerability to possible coercion, blackmail or pressure ...": "Concealment or attempts to conceal from an employer,.... immediate family members, or close associates, supervisors or coworkers, criminal conduct, mental or emotional disorders or treatment ... sexual preference, or sexual misconduct ..." DoD 5200.2–R, App. I, 32 C.F.R. § 154 App. H (1987).

In addition, the policy further explicates the meaning of the term "sexual misconduct" as used in criteria "q" above and paragraph 5 of Appendix I. The policy specifically states that "sodomy" is sexual

misconduct and describes sodomy as one form of "[d]eviant or perverted sexual behavior which may indicate a mental or personality disorder." The policy lists sodomy along with other examples of what is defined as sexual misconduct including "transsexualism, transvestism, exhibitionism, incest, child molestation, voyeurism, [and] bestiality ..." DoD 5200.2–R, App. I, 32 C.F.R. § 154, App. H (1987). Any behavior that defendants consider deviant or perverted sexual behavior that may indicate a mental or personality disorder constitutes sexual misconduct.

### The Present Lawsuit

This nationwide class action challenges the constitutionality of these policies and practices of DISCO and DISCR that result in subjecting lesbian and gay applicants for Secret and Top Secret clearances to expanded investigations and mandatory adjudications to which straight people are not subjected. Plaintiffs in this suit do not allege that defendants have a practice or policy of eventually denying security clearances to lesbian and gay applicants. Rather, plaintiffs contest the delays, the expanded investigations, and further adjudications in the process of obtaining clearances to which gay people are subjected but straight people are not. In its July 3, 1985 Order, this Court certified a class consisting of:

> All gay persons who, since January 1982, have applied for, are now applying for, or may in the future apply for Secret or Top Secret industrial clearances from DISCO, in any of the eight DIS regions in the country, and all gay persons who, since January, 1982, have held, now hold, or may in the future hold such clearances.

There are three individually named plaintiffs: Timothy Dooling, Joel Crawford, and Robert Weston. Plaintiff Dooling is a gay person who applied for a Secret industrial clearance on May 2, 1983 as required for the job he accepted at Lockheed Missiles and Space Company. On March 22, 1984,

DISCO issued a memorandum in which it recommended that Dooling be considered ineligible for a security clearance, and it forwarded the case to DISCR. The memorandum contained five reasons for denying the clearance; all dealt with homosexuality. In spite of DISCO's actions, DISCR eventually granted Dooling Secret clearance in May 1984, approximately one year after he applied.

Plaintiff Crawford is a gay person who applied for a Secret clearance in December 1981. After DISCO recommended that Crawford be considered ineligible for a Secret clearance, DISCR denied the clearance based on "homosexual activity and susceptibility to coercion." After receiving a letter from Crawford's attorney, DISCR withdrew its decision for further consideration. After conducting further investigation, DISCR again denied Crawford's application for a Secret clearance. However, DISCR dropped the allegations of homosexual activity and susceptibility to coercion as reasons for the denial and instead relied on alleged evidence of drug abuse.

Plaintiff Weston is a gay person who in 1984 submitted an application for a Top Secret clearance as required for his job at Lockheed Missiles and Space Company. Lockheed never forwarded his application to the Department of Defense because his application revealed that he belonged to a gay organization. In not forwarding his application, Lockheed followed classified Department of Defense guidelines that instructed companies not to submit Top Secret applications to the Department absent compelling need if the applications contained information that would result in lengthy processing delays and the possibility that access would be eventually denied. Such information included homosexuality. Although the Defense Department guidelines no longer instruct companies to withhold applications containing information regarding homosexuality, Weston has not received and still seeks a Top Secret clearance.[3]

---

**3.** The Court also notes the evidence on the record regarding Jeffrey Barber, a class member in the lawsuit, though not a named class representative. In October 1986, Mr. Barber submitted an application for a Secret clearance. In his application, Barber on his own initiative

Plaintiffs ask this Court to: 1) declare unconstitutional and enjoin the DISCO policy of refusing to grant clearances to gay people who have participated in homosexual activity within the past fifteen years and requiring that applications of gay people be forwarded to DISCR for adjudication; 2) declare unconstitutional and enjoin DIS practice of subjecting gay applicants to in-depth and time-consuming investigations that are required by the DIS Manual for Personnel Security Investigations; 3) declare unconstitutional the five reasons DISCO used to recommend denial of plaintiff Dooling's clearance; 4) declare unconstitutional DISCR's processing of plaintiff Crawford's application subsequent to the filing of this lawsuit; 5) purge the Defense Central Index of Investigations of derogatory information about all class members. Plaintiffs seek an injunction enjoining defendants from continuing to enforce such policies.

*Expanded Investigations and Mandatory Adjudications*

Presently, before the Court are plaintiffs' and defendant's cross-motions for summary judgment. We turn first to plaintiffs' claims that DISCO's policy of refusing to grant clearances to gay people who have participated in homosexual activity within the past fifteen years and that DIS's subjecting lesbian and gay applicants to expanded investigations violates plaintiffs' constitutional rights. Plaintiffs claim that defendants' conduct violates their rights under the equal protection and due process clauses of the fifth amendment and the first amendment of the United States Constitution.

*Equal Protection*

■ We turn first to plaintiffs' equal protection claim. Before examining the substance of the equal protection claim, we must examine the issue of standing. Defendants claim that plaintiffs Dooling, Crawford, and Weston do not have standing to bring this suit. The Court disagrees. To have standing plaintiff must show that he or she has suffered (1) a distinct and tangible personal injury that is (2) fairly traceable to the defendant's challenged action and (3) likely to be redressed by the requested relief. *McMichael v. County of Napa*, 709 F.2d 1268, 1270 (9th Cir.1983). Defendants do not claim that what the plaintiff contends is injury is not traceable to defendant's actions or that if it were injury it would not be redressed by the requested relief. Rather, defendant maintains that none of the plaintiffs has suffered a distinct and tangible personal injury.

Plaintiffs have shown distinct and tangible personal injury caused by the stigma of unequal treatment. In *Matthews v. Heckler*, 465 U.S. 728, 739, 104 S.Ct. 1387, 1395, 79 L.Ed.2d 646 (1983), the United States Supreme Court held that the denial of equal treatment alone was adequate injury for plaintiffs to have standing. The Court in *Matthews* held that male plaintiffs had standing to challenge a program that provided greater benefits to women than men, even though the Court had the power by statute only to revoke the benefits from women, not grant them to men. Plaintiffs had standing because the Court could rectify the unequal treatment based on gender, even though it could not affirmatively grant additional monetary benefits to men. "The right to equal treatment guaranteed by the Constitution is not coextensive with any substantive rights to the benefits denied the party discriminated against. Rather, as we have repeatedly emphasized, discrimination itself, by perpetutating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, (citation omitted) can cause serious

revealed that he was a gay man. Barber stated, "I would like to make it clear that I am an openly gay man." Barber further stated that all his sexual activities were "non-commercial with consenting adults in private." Barber also revealed that his family, friends, co-workers, and supervisors all knew that he was gay and de-

clared that "I don't care who in the world knows I am gay or what I do sexually." In January 1987, Barber was subjected to an in-depth interview regarding his sexuality and sexual activities. As of May 1987, over seven months after the date of his application, Barber had not received a Secret clearance.

noneconomic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Id.* at 739–40, 104 S.Ct. at 1395.

Here, plaintiffs need not show that lesbians and gay men have a substantive right not to be subjected to expanded investigations and automatic referral of their cases to DISCR.[4] The fact of unequal treatment is sufficient injury. Gay people are subjected to expanded investigations and mandatory adjudications; straight people are not. Plaintiffs' injuries from being subjected to expanded investigations and mandatory adjudications merely because they are gay are sufficient alone to give plaintiffs standing.[5]

We now turn to the merits of plaintiffs' equal protection claim. It is well established that there are three standards of review that this Court may apply under equal protection analysis: strict scrutiny, heightened scrutiny, and rational basis review. This Court should apply strict scrutiny to classifications that disadvantage a "suspect" class or that impinge upon the exercise of a "fundamental right." Heightened scrutiny is proper when the classification disadvantages a "quasi-suspect" class. *Plyler v. Doe*, 457 U.S. 202, 216–17, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982). Otherwise, the rational basis test should be applied. Under the strict scrutiny test, a classification violates the equal protection clause unless it is "precisely tailored to serve a compelling governmental interest."

*Id.* at 217, 102 S.Ct. at 2395. Under heightened scrutiny, the classification must be "substantially related to a legitimate state interest." *Mills v. Habluetzel*, 456 U.S. 91, 99, 102 S.Ct. 1549, 1554, 71 L.Ed.2d 770 (1982). Under rational basis scrutiny, the classification need be "rational related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).

■ Existing case law does not firmly establish the standard of review that this Court should apply under the equal protection clause to evaluate defendants' policy that disadvantages lesbians and gay men and impinges upon their right to engage in any homosexual activity. Given the absence of controlling authority in this area, this Court holds that classifications that disadvantage lesbians and gay men and impinge upon the right to engage in any homosexual activity must withstand either strict scrutiny because they impinge upon the right to engage in any type of homosexual activity or heightened scrutiny because they disadvantage a "quasi-suspect" class.

First, we turn to the issue of gay people as a "quasi-suspect" class. This Court finds that gay people are a "quasi-suspect class" entitled to heightened scrutiny under the equal protection clause. At present, the United States Supreme Court has not decided this issue. Indeed, Justice Blackmun noted this fact in his dissent in

---

4. The line of cases defendants cite to the contrary is inapposite. These cases do not address the issue of whether a plaintiff has suffered sufficient injury to have standing to bring a claim under the equal protection clause. Rather, these cases address whether certain government actions with respect to a person's application for a security clearance constitute a deprivation of liberty under the due process clause. *Molerio v. FBI*, 749 F.2d 815, 824 (D.C.Cir.1984) holds that a person's being denied a security clearance does not necessarily constitute a deprivation of liberty such that the government must provide him procedural due process. *See also Doe v. Casey*, 796 F.2d 1508, 1523 (D.C.Cir. 1986), *cert. granted*, — U.S. —, 107 S.Ct. 3182, 96 L.Ed.2d 671 (1987). However, these cases do not establish that under equal protection analysis, a person who is a member of given class has not suffered sufficient injury to

have standing when he is denied benefits that members of another class receive. Even though not receiving a security clearance is not necessarily a deprivation of liberty under the due process clause, being subjected to an expanded investigation and mandatory adjudication for a security clearance merely because of membership in a given class is sufficient injury for a plaintiff to have standing to bring an equal protection claim.

5. In addition, the record is clear that defendants' actions caused all three named plaintiffs, Dooling, Crawford, and Weston, to suffer harm to their employment opportunities and to the development of their careers. Defendants' Motion to Strike Portions of the Declarations of Dooling and Crawford is denied.

*Bowers v. Hardwick,* —— U.S. ——, 106 S.Ct. 2841, 2850 n. 2, 92 L.Ed.2d 140 (1986) (Blackmun, J. dissenting). *Hardwick* does not address the level of scrutiny classifications that disadvantage lesbians and gay men should receive under the equal protection clause. *Hardwick* holds only that under the due process clause lesbians and gay men have no fundamental right to engage in sodomy. *Id.* at 2843.

In the absence of controlling authority on the specific issue of the rights of lesbians and gay men under the equal protection clause, this Court must rely upon the principles the Supreme Court has set forth in other cases that addressed the proper level of scrutiny to be applied to other classifications. The Supreme Court in *City of Cleburne, Tex. v. Cleburne Living Center,* 105 S.Ct. at 3249 (1985) explicated the factors that the Court had used in previous cases to determine whether a group of people should be considered a "suspect" or "quasi-suspect" class. The rationale of the Supreme Court in *Cleburne* mandates that classifications based on sexual orientation be scrutinized under a heightened standard of review analogous to the standard of review afforded classifications based on gender.

Many of the factors the Supreme Court in *Cleburne* identified as important to providing strict scrutiny to classifications based on race, alienage, and national origin and heightened scrutiny to classifications based on gender apply to classifications based on sexual orientation. The *Cleburne* Court noted that racial classifications should receive strict scrutiny because laws disfavoring racial groups likely reflected "prejudice and antipathy." *Cleburne,* 105 S.Ct. at 3255. With respect to classifications based on gender, the Court observed that heightened scrutiny is proper because "the sex characteristic frequently bears no relation to ability to perform or contribute to society," and that classifications based on gender likely reflected "outmoded notions of the relative capabilities of men and women," rather than "meaningful considerations" about the sexes. *Id.* at 3255 (citations omitted).

Lesbians and gay men have been the object of some of the deepest prejudice and hatred in American society. Some people's hatred for gay people is so deep that many gay people face the threat of physical violence on American streets today. Justice Brennan, in his dissent from the Supreme Court's denial of certiorari in *Rowland v. Mad River Local School District,* 470 U.S. 1009, 105 S.Ct. 1373, 84 L.Ed.2d 392 (1985), concluded that "homosexuals have historically been the object of pernicious and sustained hostility, and it is fair to say that discrimination against homosexuals is 'likely ... to reflect deep-seated prejudice rather than ... rationality.' " *Id.* at 1377, (quoting *Plyler v. Doe,* 457 U.S. 202, 216 n. 14, 102 S.Ct. 2382, 2394 n. 14, 72 L.Ed.2d 786 (1982)).

Wholly unfounded, degrading stereotypes about lesbians and gay men abound in American society. Examples of such stereotypes include that gay people desire and attempt to molest young children, that gay people attempt to recruit and convert other people, and that gay people inevitably engage in promiscuous sexual activity. Many people erroneously believe that the sexual experience of lesbians and gay men represents the gratification of purely prurient interests, not the expression of mutual affection and love. They fail to recognize that gay people seek and engage in stable, monogamous relationships. Instead, to many, the very existence of lesbians and gay men is inimical to the family. For years, many people have branded gay people as abominations to nature and considered lesbians and gay men mentally ill and psychologically unstable.

As with attitudes about racial groups discussed in *Cleburne,* 105 S.Ct. at 3255, these attitudes about gay people reflect "prejudice and antipathy" against gay people, because they do not conform to the mainstream. The stereotypes have no basis in reality and represent outmoded notions about homosexuality, analogous to the "outmoded notions" of the relative capabilities of the sexes that require heightened scrutiny of classifications based on gender. *Id.* at 3255. The fact that a person is lesbian or gay bears no relation to

the person's ability to contibute to society. Rather than somehow being enemies of American culture and values, lesbians and gay men occupy positions in all walks of American life, participate in diverse aspects of family life, and contribute enormously to many elements of American culture.

In addition, the pervasive discrimination against gay people has seriously impaired their ability to gain a politically viable voice for their views in state and local legislatures and in Congress. As Judge Williams stated, "[h]omosexuals attempting to form associations to represent their political and social beliefs, free from the fatal reprisals for their sexual orientation they anticipate in jobs or other social activities" are the type of "discrete and insular minority" that meets the *Carolene Products* test for suspect classification. *Adolph Coors Co. v. Wallace*, 570 F.Supp. 202, 209 n. 24 (N.D. Cal.1983); *see also People v. Onofre*, 51 N.Y.2d 476, 434 N.Y.S.2d 947, 415 N.E.2d 936 (N.Y.1980), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2323, 68 L.Ed.2d 845 (1981); *Gay Law Students Ass'n v. Pacific Tel. & Tel.*, 24 Cal.3d 458, 156 Cal.Rptr. 14, 595 P.2d 592 (1979); Note, The Constitutional Status of Sexual Orientation: Homosexuality as a Suspect Classification, 98 Harv.L.Rev. 1285 (1985); *but see Padula v. Webster*, 822 F.2d 97 (D.C.Cir.1987) (WESTLAW, Allfeds Library) ("homosexuals, as defined as persons who engage in homosexual conduct" do not constitute a suspect or quasi-suspect classification).

Second, the Defense Department regulations at issue in this case must withstand strict scrutiny because they impinge upon the right of lesbians and gay men to engage in any homosexual activity, not merely sodomy, and thus impinge upon their exercise of a fundamental right. It is without question, that *Hardwick* established that lesbians and gay men do not have a fundamental right to engage in sodomy as defined by the Georgia statute, that is, specifically any sexual act involving the sex organs of one person and the mouth or anus of another. Such will remain the law unless *Hardwick* is overruled or the Constitution is amended. *See Hardwick*, 106 S.Ct. at 2856 (Blackmun, J. dissenting) (re-

ferring to the Supreme Court's power to recognize error in its analysis of a case, "I can only hope that here, too, the Court soon will reconsider its analysis and conclude that depriving individuals of the right to choose for themselves how to conduct their intimate relationships poses a far greater threat to the values most deeply rooted in our Nation's history than tolerance of non-conformity could ever do.")

■ Even though the Supreme Court in *Hardwick* held that a state law criminalizing homosexual sodomy is not subject to strict scrutiny, this Court finds that a government classification, such as the one at issue in this case, that disadvantages lesbians and gay men because of *any* homosexual activity or sexual preference *itself* is subject to strict scrutiny. In the present case, DISCO will conduct an expanded investigation of an applicant and refer his case to DISCR for adjudication if within the last fifteen years, the applicant has engaged in any homosexual "activity," not just sodomy. The DIS manual lists homosexuality in general as "sexual misconduct," "aberrant sexual behavior," and "deviant sexual conduct" that requires special investigation. The Defense Department adjudication policy considers concealment of "sexual preference" itself, without any sexual conduct, to be a disqualifying factor.

The Supreme Court in *Hardwick* simply did not address the issue of all homosexual activity. The Court in *Hardwick* stated that "[t]he issue presented is whether the Federal Constitution confers fundamental right upon homosexuals to engage in *sodomy*." *Id.* at 2843 (emphasis added). *Hardwick* does not hold, for example, that two gay people have no right to touch each other in a way that expresses their affection and love for each other. Nor does *Hardwick* address such issues as whether lesbians and gay men have a fundamental right to engage in homosexual activity such as kissing, holding hands, caressing, or any number of other sexual acts that do not constitute sodomy under the Georgia statute. *Hardwick* simply did not address

the issue of discrimination based on sexual orientation or sexual preference itself.

Indeed, *Hardwick* did not address the constitutionality of a statute such as the one considered by the Missouri Supreme Court in *State v. Walsh*, 713 S.W.2d 508, 509 (Mo.1986) (en banc), that proscribed "deviate sexual intercourse," defined as "[a]ny sexual act involving the genitals of one person and the mouth, tongue, hand or anus of another person." *Id.* at 509. Dissenting from the Missouri Supreme Court's affirmance of a prosecution for "attempted sexual misconduct," Judge Blackmar stated, "I am ... inclined to believe that ... [the Missouri statute] goes beyond the limits of state power in defining 'deviate sexual intercourse' as involving the hand. This is not the offense of sodomy as discussed in the opinion of the Supreme Court of the United States in *Bowers v. Harwick.*" *State v. Walsh*, 713 S.W.2d at 514 (Blackmar, J. dissenting).

The D.C. Circuit has recognized that *Hardwick* did not address the constitutionality of laws that discriminate against individuals because of their homosexual orientation not because of homosexual sodomy or conduct. The D.C. Circuit stated that the Supreme Court in *Hardwick* "did not reach the difficult issue of whether an agency of the federal government can discriminate against individuals merely because of sexual *orientation.*" *Doe v. Casey*, 796 F.2d 1508, 1522 (D.C.Cir.1986), *cert. granted,* — U.S. ——, 107 S.Ct. 3182, 96 L.Ed.2d 671 (U.S. June 8, 1987) (emphasis in original). At least one district court has followed *Casey.* In *Swift v. United States*, 42 FEP Cases (BNA) 787, 790 (D.D. C.1987), the court stated that "this Circuit has declined, at least for the moment, to read that decision (Hardwick) as barring claims of discrimination based on sexual preference." *Id.* at 790.

The rationale behind *Hardwick* and other Supreme Court right to privacy opinions provides that lesbians and gay men have a fundamental right to engage in other types

of homosexual activity that are not traditionally proscribed as sodomy. Although the issue of whether *heterosexuals* have a fundamental right to engage in sodomy was not before the Court in *Hardwick* and this Court will not express its view of the correctness of the controversial *Hardwick* decision, it appears to this Court that the proper interpretation of *Hardwick* is that under the Constitution no person has a fundamental right to engage in sodomy, not that lesbians and gay men have no fundamental right to engage in other types of affectional or sexual activity.

It is important to note that, at present, it has not been established that anyone, heterosexual or homosexual, has a fundamental right to engage in sodomy. The United States Supreme Court has never held that heterosexuals have a fundamental right to engage in sodomy. Significantly, eighteen of the twenty-four states and the District of Columbia that continue to proscribe sodomy, proscribe it for heterosexuals as well as homosexuals.[6] Justice Stevens' dissent in *Hardwick* observed that "[t]he history of the statutes cited by the majority ... reveals a prohibition on heterosexual, as well as homosexual, sodomy." *Id.* at 2857 (Stevens, J. dissenting). Justice Stevens further stated that "the homosexual and the heterosexual have the same interest in deciding how he will live his own life, and, more narrowly, how he will conduct himself in his personal and voluntary asssociations with his companions. State intrusion into the private conduct of either is equally burdensome." *Id.* at 2858 (Stevens, J. dissenting).

Furthermore, a central rationale for the *Hardwick* Court's finding that lesbians and gay men have no fundamental right to engage in sodomy was the fact that many states continue to outlaw sodomy. *Hardwick*, 106 S.Ct. at 2845. However, the same cannot be said about other types of homosexual activity. None of the fifty states outlaws the act of two people of the same sex kissing one another, holding

---

**6.** These states include Alabama, Arizona, District of Columbia, Florida, Georgia, Idaho, Kentucky, Louisiana, Maryland, Michigan, Minneso-ta, North Carolina, Oklahoma, Rhode Island, South Carolina, Tennessee, Utah, and Virginia.

hands together, or caressing each other. In fact, the Florida statute explicitly states that only "sodomy, fellatio, or cunnilingus" are "historically forbidden sex act(s)." Fla. Stat.Ann. § 800.02 (West 1984). Missouri is the only state in the union that specifically outlaws sexual acts involving the hand.[7] Only three other state statutes could conceivably be construed to outlaw such behavior.[8] Justice Blackmar of the Missouri Supreme Court observed that acts involving the hand have "no long history of legal sanction such as seemed very important to Justice White" in *Hardwick*. *Walsh*, 713 S.W.2d at 514 (Blackmar, J. dissenting).

The rationale of previous Supreme Court cases such as *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), and *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), that establish a right to privacy mandates that this Court find that lesbians and gay men, as well as all people, have a fundamental right to engage in affectional and sexual activity that has not been traditionally proscribed as sodomy. The Constitution protects an individual's right to express attraction, affection or love for another human being through sexual activity that does not constitute the specific acts that the Supreme Court in *Hardwick* held are not entitled to Constitutional protection.

Affectional and sexual intimacy plays an extremely important role in the lives of all people, both gay and straight alike. "Highly personal relationships" and "certain kinds of personal bonds" lie at the heart of a person's "ability independently to define one's identity." *Roberts v. United States Jaycees*, 468 U.S. 609, 618, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). Affectional and sexual relationships form a "central ... part of an individual's life." *Hardwick*, 106 S.Ct. at 2851 (Blackmun, J. dissenting). Sexual intimacy for gay people and straight people is a "sensitive, key relationship of human existence, central to

family life, community welfare, and the development of human personality." *Id.* at 2851 (quoting *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 63, 93 S.Ct. 2628, 2638, 37 L.Ed.2d 446 (1973)).

Protecting people's right to engage in such intimate sexual relationships of their choosing is a essential element of American liberty because this aspect of life occupies such an important part of all human beings' lives. The freedom to express physically such basic human emotions and feelings is "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). People's liberty to engage in such physical expressions of affection is "deeply rooted in this Nation's history and tradition." *Moore v. East Cleveland*, 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977) (opinion of Powell, J.). The Supreme Court has long recognized that a primary purpose of the Bill of Rights is to secure "individual liberty." *Roberts v. United States Jaycees*, 468 U.S. at 618, 104 S.Ct. at 3250.

The fact that gay people engage in such intimacy in a different way than straight people does not diminish the importance of intimacy in gay people's lives. "[M]uch of the richness of a relationship will come from the freedom an individual has to *choose* the form and nature of these intensely personal bonds." *Hardwick*, 106 S.Ct. at 2851 (Blackmun, J. dissenting) (emphasis in original). One of the central aspects of the "culture and traditions of the Nation" is to "foster diversity." *Roberts*, 468 U.S. at 618–19, 104 S.Ct. at 3250.

Even if this Court were to hold that the classifications at issue in this case were not subject to strict scrutiny because they impinge upon a fundamental right or heightened scrutiny because they disadvantage a quasi-suspect class, defendants' actions must withstand scrutiny under the rational relation test. Under rational basis scrutiny, defendants are not free to discriminate

---

**7.** *See* Mo.Ann.Stat. § 566.090 (Vernon 1982).

**8.** *See* Ark.Stat.Ann. § 41–1813 (1975); Md.Ann. Code Art. 27 §§ 553–54 (Supp.1982); Mont.Code Ann. § 45–5–505 (1981).

against lesbians and gay men at will. The equal protection clause requires that all people similarly situated be treated alike. *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985), (citing *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)).

Under the rational basis test, gay people are protected against invidious discrimination. Government actions that disadvantage lesbians and gay men must be rationally related to a legitimate government purpose in order to survive equal protection scrutiny. A classification "whose relationship to an asserted goal is so attenuated as to 'render the distinction arbitrary or irrational" violates equal protection. *Cleburne* at 3258. Similarly, "some objectives—such as 'a bare ... desire to harm a politically unpopular group,'" do not constitute legitimate government purposes. *Id.* at 3258 (quoting *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 535, 93 S.Ct. 2821, 2826, 37 L.Ed.2d 782 (1973)). In *Cleburne* the Supreme Court applied the rational relation test to strike down a zoning ordinance that required a special use permit for homes for the mentally retarded. The Court held that the ordinance failed even the lowest level of equal protection scrutiny because the ordinance rested on "an irrational prejudice against the mentally retarded," not a rational basis for treating the mentally retarded differently. *Cleburne* at 3260. Similarly, the district court in *Swift v. United States,* 42 FEP Cases (BNA) 787 (D.D.C.1987), held that government actions disfavoring lesbians and gay men must have a rational basis to withstand equal protection scrutiny. "Government may not discriminate against homosexuals for the sake of discrimination, or for no reason at all." *Id.* at 791.

█ Turning to the record of this case, the undisputed facts show that defendants' actions violate plaintiffs' rights under the equal protection clause under strict scrutiny, heightened scrutiny, and rational basis scrutiny, because there is no rational basis for defendants' subjecting all gay applicants to expanded investigations and mandatory adjudications while not doing the same for all straight applicants. Defendants' treatment of lesbians and gay men reflects irrational prejudice and outmoded stereotypes and notions about lesbians and gay men, not rational considerations. The government's interest in protecting national security is undeniably significant. However, the equal protection clause forbids the Department of Defense under the guise of protecting national security to employ outmoded attitudes, prejudices, and stereotypes to subject lesbian and gay applicants to expanded investigations to which it does not subject straight applicants. An examination of the record shows that defendants have put forth no evidence that shows that their policies and procedures are precisely tailored, substantially related, or even rationally related to the governmental interest.

Defendants' first argument to support its position that its actions are supported by a rational basis is that homosexual conduct may constitute a criminal violation and call into question an individual's willingness to uphold public law. This argument is without merit. First, homosexual sodomy is not a crime in over half the states. *See* Survey on the Constitutional Right to Privacy in the Context of Homosexual Activity, 40 U.Miami L.Rev. 521, 524 n. 9 (1986). It appears that people who engage in private consensual sodomy rarely if ever face actual prosecution today. In fact, the state of Georgia never even presented a criminal charge to the grand jury against plaintiff in *Hardwick,* 106 S.Ct. at 2848 n. 2 (Powell, J. concurring). Justice Powell in his concurrence in *Hardwick,* noting that there was no reported decision involving prosecution under the Georgia statute for several decades, suggested that actual prosecution and imprisonment of plaintiff may violate the eighth amendment. He described laws proscribing private consensual sodomy as having a "history of nonenforcement" that suggests the "moribund character" of such laws today. *Id.* at 2848 n. 2.

In addition, as discussed above, all but four of the states that continue to outlaw

homosexual activity only outlaw acts involving the sexual organs of one person and the mouth or anus of another, not all sorts of other homosexual activity that would result in an applicant's being subject to expanded investigation and adjudication by DISCR. Furthermore, as discussed above, eighteen of the twenty four states and the District of Columbia that continue to proscribe sodomy, proscribe it for both homosexuals and heterosexuals. Consequently, if engaging in private consensual sodomy indicates lack of willingness to uphold public law, heterosexuals' willingness to uphold public law appears equally to be called into question. Finally, the fact that a person lacks respect for one law does not imply that he lacks respect for laws in general. The argument that persons who "behave improperly in one regard are likely to transgress in others.... is both a logical nonsequitur and a psychological error." *Major v. Hampton*, 413 F.Supp. 66, 71 n. 4 (E.D.La.1976) (citing Rosenblum, Moral Character, 27 Stanford Law Review 925 (1975)).

The second argument defendants offer to support their policy of subjecting all lesbian and gay applicants to expanded investigations is that a "homosexual may face emotional tension, instability or other difficulties since society has not recognized his sexual practice as mainstream." To support this contention, defendant relies on evidence that plaintiffs Crawford and Dooling allegedly had emotional problems adjusting to their sexual orientation. In addition, defendants provide a newpaper account of a person who at his sentencing claimed that he stole secret documents "to prove ... I could be a man and still be gay." Finally, defendants provide what can only be regarded as a submission of questionable impact, an excerpt from a book by John Barron entitled *KGB The Secret Work of Soviet Secret Agents*, subtitled "with photographs of agents, assas-

sins, seductresses and victims," which at best can be described as fictionalized history.[9] On the cover of the paperback edition submitted with defendants' papers, Robert Conquest, author of *The Great Terror* describes the book as "exciting as a dozen thrillers." Defendants provide absolutely no evidence that suggests that Mr. Barron has any professional expertise regarding the psychological well-being of lesbians and gay men. In the book, Barron baldly claims without support that the KGB believes that "homosexuality often is accompanied by personality disorders that make the victim potentially unstable and vulnerable to adroit manipulation." According to Barron, the KGB believes that the fact that homosexuals are aware that they are different makes them want to seek revenge against society.

Defendants' arguments are without merit. For years the uncontroverted consensus of the American professional psychological community has been that homosexual orientation itself is not a psychological problem. Fourteen years ago, the American Psychiatric Association stated that "[h]omosexuality per se is one form of sexual behavior and, like other forms of sexual behavior which are not by themselves psychiatric disorders, is not listed in this nomenclature of mental disorders." In its *Position Statement on Homosexuality and Civil Rights*, December 15, 1973, the American Psychiatric Association advised that "no burden of proof of such judgment, capacity, or reliability shall be placed upon homosexuals greater than that imposed on any other persons." The American Psychological Association has declared that "homosexuality per se implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Resolution of the American Psychological Association*, January 1975.[10]

Furthermore, the Ninth Circuit in immigration cases has relied on the fact that the

---

**9.** Even though there may be hearsay problems regarding the admissability of this evidence, it is offered by defendants in the Declaration of Richard E. Fay in Support of Defendants' Motion for Summary Judgment without objection by plaintiffs and is thus part of the record.

**10.** These documents are part of the record contained in Second Declaration of Richard Gayer on Motion for Summary Judgment, offered by plaintiffs without objection by defendants.

United States Public Health Service no longer considers homosexuality *per se* to be a mental disorder and refuses to issue medical certificates solely on the basis of homosexuality. *Hill v. United States I.N.S.*, 714 F.2d 1470, 1472, 1481 (9th Cir. 1983). In *Hill,* the Ninth Circuit observed that the Public Health Service recognized that "current and generally accepted canons of medical practice" do not consider homosexuality *per se* to be a psychiatric disorder. *Id.* at 1472. Furthermore, the Ninth Circuit noted that the Surgeon General in making this determination relied on the professional expertise of recognized medical organizations including the American Psychiatric Association, the American Psychological Association, the American Public Health Association, the American Nurses' Association, and the Counsel of Advanced Practitioners in Psychiatric and Mental Health Nursing of the American Nurses' Association. *Id.* at 1472 n. 3.

Moreover, the fact that an individual may experience emotional tension and instability because she has problems adjusting to her sexual orientation does not mean that all lesbian and gay applicants should be subjected to expanded investigations. Many people experience emotional problems about many different aspects of their lives. The equal protection clause requires defendants to consider any problems an individual gay person may have with his sexual orientation in the same manner in which they consider any other person's personal problems. The Department of Defense may not subject all lesbians and gay men to expanded investigations merely because some gay people may have emotional problems adjusting to their sexual orientation.

Defendants' third argument to support their policies is based on the alleged concern that a lesbian or gay man who is secretive about her or his sexuality may be a candidate for blackmail. Defendants use this argument to justify both conducting expanded investigations and mandatory adjudications of all lesbian and gay applicants and considering concealment of sexual preference or sexual misconduct to be a disqualifying factor in the adjudication policy. As the basis for this argument, defendants point to one isolated occasion upon which plaintiff Dooling was approached regarding blackmail and evidence that seven British servicepersons were prosecuted for allegedly passing sensitive information to foreign intelligence agents in which the prosecution presented evidence that the conspiracy was initiated by the blackmail of a homosexual serviceperson.

These submissions are not persuasive. Defendants have produced no evidence on the record that lesbians and gay men are particularly subject to blackmail. First, plaintiff Dooling unequivocally rejected the blackmail attempt. Furthermore, defendants admit that the servicepersons were in fact *acquitted* of any charges involving passing sensitive information. Therefore, the information regarding blackmail was at no time established as true but was only evidence presented and apparently rejected by the trier of fact. The record in this case is absolutely clear. There is simply no evidence of either a gay applicant for a security clearance having been tempted by blackmail or any lesbians or gay men who have obtained industrial clearance having transmitted classified information to anyone unauthorized to receive it. At the Senate Permanent Subcommittee on Investigations hearings of April 1985, the FBI and the Defense Intelligence Agency produced no evidence of persons being blackmailed because of homosexuality. Of the approximately 40 "significant" espionage cases, two involved gay people; neither of these involved blackmail. *Federal Government Security Clearance Programs: Hearings Before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs United States Senate,* 99th Cong., 1st Sess. 171–187, 913–926 (1985).

Defendants' submissions do not provide the basis for either defendants' policy of submitting all lesbians and gay men to expanded investigations and mandatory adjudications or defendants' policy of considering concealment of sexual activity or sexual preference to be a disqualifying factor. Turning first to the expanded investiga-

tions of all gay applicants, the fact that an individual may be secretive about certain homosexual conduct that he may have engaged in does not provide the basis for subjecting all lesbian and gay applicants to expanded investigations. Given the large number of lesbians and gay men who are completely open and public about their sexual orientation, there is no relation between homosexuality *per se* and the need for expanded investigations. The equal protection clause requires the government to treat lesbians and gay men as individuals just as it treats straight women and men. The equal protection clause permits further investigation of an applicant not merely on the basis of the person's sexual orientation, but only upon an individualized showing that there is a factor in the person's background that renders her susceptible to blackmail.

Second, the undisputed facts in the record show that there is no rational basis for defendants' policy of considering an applicant's concealment of sexual preference or "sexual misconduct" a disqualifying factor. According to Thomas O'Brien, Director of DIS, under the policy, a person who does not affirmatively, verbally reveal her homosexuality would be guilty of concealment. Failure to disclose information, though never even asked, constitutes concealment. Similarly, the regulations require a person to reveal, on her own initiative, any acts of sexual misconduct, she may have committed. Thus, any person who has engaged in acts which would constitute sodomy, i.e. any sexual act involving the sex organs of one person and the mouth or anus of another, would be guilty of concealment, unless she revealed these acts on her own initiative to immediate family members, close associates, supervisors, and coworkers. At least with respect to engaging in sodomy, the policy would apply to all people who engaged in sodomy, not just lesbians and gay men. However, the policy would apply to all sexual activities of all lesbians and gay men because the DIS manual considers "homosexuality" to be sexual misconduct. Furthermore, because the policy relates to sexual preference itself, a person who is merely attract-

ed to people of his own sex, but engages in no activity with them, must reveal his preference to all immediate family members, close associates, coworkers, or supervisors.

The record provides no evidence of a rational relation between this policy and furthering the legitimate goal of ensuring national security. Defendants have produced no reasonable evidence linking homosexuality and blackmail. Defendants' policy represents a simplistic approach to complex issues regarding national security and potential blackmail and is not founded on any rational basis. The fact that people have aspects of their lives that they do not on their own initiative tell supervisors, associates, or even close family members does not imply that those people are security risks. All people have aspects of their lives, often private consensual sexual activities, that they prefer to keep private. This fact does not mean that those people would be susceptible to blackmail if someone were to learn of the private information. Moreover, there is no rational basis for defendants' investigating an applicant's openness about his sexual preference or homosexual activity without similarly investigating the degree to which an applicant has revealed all other possibly private aspects of his life to family members, close associates, supervisors, and coworkers. Defendants' policy is founded upon deep-seated prejudice, not a rational basis. Because defendants have provided no evidence that the regulations are even rationally related to the the legitimate interest in protecting national security, defendants' third argument fails.

Defendants' final argument to justify their expanded investigation of all people who engage in any type of homosexual activity is that DIS investigates heterosexual conduct when the conduct may involve "extramarital relations, sex with minors, prostitution, sex through force and other circumstances that may be indicative of poor judgment or may subject an individual to blackmail or undue coercion." The reasoning behind this argument lies at the heart of much of the prejudice and discrimination that lesbians and gay men face. The fact that DISCO conducts expanded

investigations of people who are involved with bestiality, sado-masochism, pedophilia and other such sexual practices does not justify expanded investigations into lesbians and gay men. The argument that engaging in affectional, emotional, and sexual relationships with people the same sex is comparable to engaging in sex through force and sex with minors betrays the dignity that lesbians and gay men, as well as all citizens, deserve. The mere fact that gay people engage in consensual sexual relationships with people of their own sex in no way affects their trustworthiness to hold a security clearance, just as the fact that straight people engage in consensual sexual relationships with people of the opposite sex does not affect their trustworthiness.

In sum, it is without question that the defendants' policies are neither closely related, substantially related or rationally related to the government's interest such that they do not survive scrutiny under the equal protection clause. The Defense Department's unequal treatment of gay people perpetuates the very types of archaic stereotypes that the DIS manual implies and that the equal protection clause attempts to extinguish, e.g. that all lesbians and gay men are emotionally unstable, sexually perverted, and particularly prone to blackmail and that homosexuality is deviant sexual behavior parallel to necrophilia, masochism, and pedophilia. Branding all lesbians and gay men as people who require more extensive investigation than straight people casts gay people as innately inferior. The fact that the government may need to conduct an expanded investigation of a lesbian or gay applicant in an individual case because of an issue relating to individualized sexual behavior does not imply that the government may subject all lesbian and gay applicants to differential treatment. The equal protection clause requires defendants to treat applicants for security clearances as individuals and permits defendants to conduct an expanded investigation or mandatory adjudication of an applicant, only because a specific individualized security concern exists, not because the applicant is lesbian or gay. Ac-

cordingly, plaintiffs' motion for summary judgment with respect to their equal protection claim is granted and defendants' motion for summary judgment with respect to the equal protection claim is denied.

*Procedural Due Process*

■ We now turn to plaintiffs' procedural due process claim. Plaintiffs claim that defendants' policy of requiring all applications of lesbian and gay people to be forwarded automatically to DISCR creates an irrebutable presumption in violation of due process. Plaintiffs' claim fails as a matter of law. Plaintiffs cite *Gueory v. Hampton,* 510 F.2d 1222, 1227 (D.C.Cir.1974) to support their contentions. However, *Gueory* does not support plaintiffs' theory. Under *Gueory,* an individual is denied procedural due process only if statutory presumptions are irrevocably applied against him and the individual receives "no opportunity for refutation." *Id.* at 1227. *See also Vlandis v. Kline,* 412 U.S. 441, 446–47, 93 S.Ct. 2230, 2233, 37 L.Ed.2d 63 (1973). Here, lesbian and gay applicants have the opportunity to argue their cases to DISCR and may appeal any adverse decision to the DISCR appeals board. Therefore, it is undisputed that plaintiffs have an opportunity to refute DISCO's failure to grant lesbian and gay applicants' Secret clearances. Consequently, the Court grants defendants' motion for summary judgment with respect to plaintiffs' procedural due process claim.

*First Amendment*

Finally, we turn to plaintiffs' claim that defendants' use of the fact that an applicant belongs to a gay organization to require expanded investigation and to require adjudication of the case violates plaintiff's first amendment rights. It is undisputed that DISCO specified in its memorandum to plaintiff Dooling that one of the reasons that his Secret clearance was not granted and that his case was forwarded to DISCR for adjudication was that he "belongs to a gay organization."

■ All citizens have first amendment rights to belong to lawful associations. *El-*

rod v. Burns, 427 U.S. 347, 356–68, 96 S.Ct. 2673, 2681–87, 49 L.Ed.2d 547 (1976). This right extends to government employees. *Clark v. Library of Congress*, 750 F.2d 89 (D.C.Cir.1984). Governmental actions that significantly impair an individual's first amendment rights must survive "exacting" scrutiny. The government must prove that the interest is "paramount" and of "vital importance." *Id.* at 94; *Elrod v. Burns*, 427 U.S. at 362, 96 S.Ct. at 2684. The government must show that its actions are the least restrictive means to achieve the government interest. If there is a less "drastic" way of attaining the governmental purpose, the government may not enact a regulation that "broadly stifles the exercise of fundamental personal liberties." *Kusper v. Pontikes*, 414 U.S. 51, 59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973).

■ It is without question that DISCO's use of mere membership in a "gay organization" to refuse to grant a clearance violates plaintiffs' first amendment rights. Being subjected to additional scrutiny and adjudication clearly chills plaintiffs' rights to associate in such organizations. Such governmental action is "imbued with the potential for subtle coercion of the individual to abandon his controversial beliefs or associations." *Clark*, 750 F.2d at 94. Defendants' policy of using mere membership in a gay organization is clearly not the least restrictive means to achieving the governmental interests in protecting national security. The fact that a person belongs to a "gay organization" in no way implies that she is not trustworthy to handle classified materials. It is conceivable that specific applicants' membership in specific organizations that may have some connection to gay activities may justify further investigation of the applicant's membership in the organization. However, that issue is not before the Court. Here, defendants simply use membership in a "gay organization" to require additional investigation. Such policy clearly violates the first amendment. Therefore, summary judgment is granted in favor of plaintiffs with respect to their first amendment claim.

*Adjudication of Plaintiff Dooling*

■ We next turn to the issue of the five reasons that DISCO gave for refusing to grant Dooling's application, forwarding his application to DISCR for further adjudication, and recommending that Dooling be considered ineligible for a security clearance. Defendants contend that this cause of action is moot because DISCO no longer adjudicates cases. However, this claim is not moot because at present DISCO uses the same criteria it used to adjudicate Dooling's case to determine whether a case requires expanded investigation or adjudication by DISCR.

The Memorandum lists five reasons DISCO considered Dooling to have been involved in a "pattern of sexual perversion." They are that he "visits gay bathhouses," "belongs to a gay organization," "has homosexual activity with casual acquaintances," "intends to inform his employer of his homosexuality," and "intends to continue his homosexual lifestyle in the future." Under the reasoning discussed above, DISCO's application of these criteria violates plaintiff Dooling's constitutional rights. Using the facts that Dooling "intends to inform his employer of his homosexuality" or that he intends to continue his "homosexual lifestyle" in the future violate plaintiff's rights under the equal protection clause. Neither of these facts suggests that plaintiff is susceptible to blackmail. Living a "homosexual lifestyle" no more than living a "heterosexual lifestyle" in and of itself suggests that Dooling would be a security risk. Similarly, the fact that plaintiff "visits gay bathhouses" or "has homosexual activity with casual acquaintances" is not the type of information that is necessarily derogatory such that Dooling should have been subjected to further adjudication. A straight person's involvement in similar activity would not necessarily give rise to additional adjudication. Finally, defendant's use of the fact that Dooling belongs to a "gay organization" is a clear violation of his first amendment rights. Therefore, summary judgment is granted in favor of plaintiff Dooling with respect to this claim.

*Adjudication of Plaintiff Crawford*

With respect to plaintiff Crawford's claim. This Court grants summary judgment in favor of plaintiff Crawford with respect to his claim regarding DISCO's refusal to grant his clearance because of his "homosexual activity and susceptibility to coercion." Use of these factors alone violates Crawford's rights under the equal protection clause. With respect to Crawford's other claims, the Court grants summary judgment in favor of defendants.

*Defense Central Index of Investigations Claim*

Because this claim is not included in plaintiff's Third Amended Complaint, the Court may not consider it.

Accordingly, good cause appearing, IT IS HEREBY ORDERED that:

1. plaintiffs' motion for summary judgment is granted in part and denied in part and defendants' motion for summary judgment is granted in part and denied in part.

2. defendants' policy of subjecting plaintiffs to expanded investigations and mandatory adjudications is declared to violate plaintiffs' rights under the first and fifth amendments to the United States Constitution;

3. defendants' reasons for denying plaintiff Dooling a Secret clearance and subjecting him to further investigation and adjudication is declared to violate plaintiff Dooling's rights under the first and fifth amendments to the United States Constitution;

4. defendants' reasons concerning homosexuality for denying plaintiff Crawford a Secret clearance are declared to violate plaintiff Crawford's rights under the fifth amendment to the United States Constitution;

5. defendants are enjoined from subjecting plaintiffs to expanded investigations, mandatory adjudications, or any other procedures based on plaintiffs' sexual orientation, homosexual activity, or membership in a gay organization;

6. plaintiffs' attorney shall be awarded a reasonable attorney's fee under 28 U.S.C. § 2412.

IT IS SO ORDERED.