**HIGH TECH GAYS; Timothy Dooling, and all others similarly situated; Joel Crawford; and Robert Weston, Plaintiffs–Appellees,**

v.

**DEFENSE INDUSTRIAL SECURITY CLEARANCE OFFICE; Director, Defense Industrial Security Clearance Office; Defense Investigative Service; Director of Defense Investigative Service; Secretary of Defense, Defendants–Appellants.**

No. 87–2987.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 16, 1988.

Decided Feb. 2, 1990.

---

Jay S. Bybee, Appellate Staff, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendants-appellants.

Richard Gayer, San Francisco, Cal., for plaintiffs-appellees.

Matthew A. Coles, San Francisco, Cal., for amicus, American Civ. Liberties Union of Northern California, Inc.

Stephen V. Bomse, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for amicus, National Gay Rights Advocates.

Before BRUNETTI and LEAVY, Circuit Judges, and CURTIS,* Senior District Judge.

BRUNETTI, Circuit Judge:

The plaintiffs-appellees challenge whether the Department of Defense's (DoD) policy of subjecting all homosexual applicants for Secret and Top Secret clearances to expanded investigations and mandatory adjudications, and whether the alleged DoD policy and practice of refusing to grant security clearances to known or suspected gay applicants, violates the equal protection component of the Fifth Amendment's Due Process Clause and the rights of free association guaranteed by the First Amendment.

In analyzing the equal protection challenge, the district court concluded that "gay people are a 'quasi-suspect class' entitled to heightened scrutiny," *High Tech Gays v. Defense Industrial Security Clearance Office*, 668 F.Supp. 1361, 1368 (N.D.Cal.1987), and that the DoD security clearance regulations "must withstand strict scrutiny because they impinge upon the right of lesbians and gay men to engage in any homosexual activity, not merely sodomy, and thus impinge upon their exercise of a fundamental right." *Id.* at 1370. The district court rejected the reasons proffered by the DoD to justify its policies and found the absence of even a "rational basis for defendants' subjecting all gay applicants to expanded investigations and mandatory adjudications while not doing the same for all straight applicants." *Id.* at 1373. The district court therefore concluded that the DoD policy violates the Constitution and granted summary judgment to the plaintiffs. We reverse the part of the district court's order granting summary judgment to the plaintiffs, vacate the part denying summary judgment to the DoD, and remand to enter summary judgment in favor of the DoD.

## I.

### *Background*

#### A.

This appeal involves a class action[1] challenging the mandatory investigation of all homosexual[2] applicants seeking a Secret or Top Secret clearance. The clearance process begins when the defense contractor

---

* Honorable Jesse W. Curtis, Senior United States District Judge, Central District of California, sitting by designation.

1. The plaintiff class consists of:

    All gay persons who, since January 1982, have applied for, are now applying for, or may in the future apply for Secret or Top Secret industrial clearances from DISCO, in any of the eight DIS regions in the country, and all gay persons who, since January, 1982, have held, now hold, or may in the future hold such clearances.

2. Throughout this opinion, the term "homosexual" is used synonymously with the terms "lesbian" or "gay."

forwards an individual's name to the DoD for Secret or Top Secret clearance. 32 C.F.R. §§ 154.30, .31 (1987).[3] For a Secret clearance, the Defense Industrial Security Clearance Organization (DISCO) conducts a National Agency Check (NAC), which consists at a minimum of a record check of the Federal Bureau of Investigation and the Defense Central Intelligence Index, but may also include a record check of the Office of Personnel Management, the Immigration and Naturalization Service, the State Department, and the Central Intelligence Agency. 32 C.F.R. § 154.3(m); DoD 5200.2–R, app. B (1979). For Top Secret clearance, the Defense Investigative Service (DIS) completes a Background Investigation (BI) for each applicant, which consists of a NAC, local records check, and interviews with personal sources.

DISCO will grant a Secret clearance if no adverse or questionable information is developed by the NAC. If adverse information arises from the NAC, DIS conducts an expanded investigation to substantiate or disprove the adverse or questionable information and conducts a personal interview of the applicant. 32 C.F.R. § 154.8(i)(2), (j). If information obtained from the expanded investigation resolves the question of potentially adverse information, DISCO grants the Secret clearance. Similarly, for a Top Secret clearance application, if the BI resolves any potentially derogatory information that may have arisen during the investigation, DISCO grants the clearance. The Department of Defense Personnel Security Program, DoD 5200.2–R, app. E (1979), provides guidelines for DISCO in determining whether there is significant

adverse information that prevents the granting of a clearance. 32 C.F.R. pt. 154, app. D.

For both Secret and Top Secret clearances, if DISCO cannot find that granting the security clearance would be clearly consistent with the national interest, the case is referred to the Directorate for Industrial Security Clearance Review (DISCR) for review and adjudication. 32 C.F.R. §§ 155.-2(c), .7(a). DISCR evaluates the application under the standards and criteria set forth in the DoD directives and determines whether or not to grant a clearance. 32 C.F.R. § 155.7(b).

> The personnel security standard that must be applied to determine whether a person is eligible for access to classified information or assignment to sensitive duties is whether, based on all available information, the person's loyalty, reliability, and trustworthiness are such that entrusting the person with classified information or assigning the person to sensitive duties is clearly consistent with the interests of national security.

32 C.F.R. § 154.6(b).

> The ultimate decision in applying ... § 154.6(b) and (c) must be an overall common sense determination based upon all available facts.

32 C.F.R. § 154.7.

Section 154.7 provides a list of criteria for determining eligibility for a clearance under this standard.[4] These criteria are further explained in 32 C.F.R. pt. 154, appendices D and H. In appendix D, number 2, acts of sexual misconduct under 32 C.F.R. § 154.7(q) are defined to include "all

---

**3.** All references to the C.F.R. are to the 1987 edition unless otherwise noted.

**4.** 32 C.F.R. § 154.7 provides in pertinent part: The criteria for determining eligibility for a clearance under the security standard shall include, but not be limited to the following:
  (a) Commission of any act of sabotage, espionage, treason, terrorism, anarchy, sedition, or attempts thereat or preparation therefor, or conspiring with or aiding or abetting another to commit or attempt to commit any such act.
  (b) Establishing or continuing a sympathetic association with a saboteur, spy, traitor,

seditionist, anarchist, terrorist, revolutionist, or with an espionage or other secret agent or similar representative of a foreign nation whose interests may be inimical to the interests of the United States, or with any person who advocates the use of force or violence to overthrow the Government of the United States or to alter the form of Government of the United States by unconstitutional means.
  (c) Advocacy or use of force or violence to overthrow the Government of the United States or to alter the form of Government of the United States by unconstitutional means.

indications of moral turpitude, heterosexual promiscuity, aberrant, deviant or bizarre sexual conduct or behavior, transvestitism [sic], transsexualism, indecent exposure, rape, contributing to the delinquency of a minor, child molestation, wife-swapping, window peeping, and similar situations from whatever source." 32 C.F.R. pt. 154, app. D, no. 2.

In appendix H, each category is further broken down into sections describing disqualifying factors and mitigating factors. The disqualifying factors under sexual misconduct include conduct involving acts performed in open or in public places; acts performed with minors or animals; acts involving inducement, force, coercion, or violence; prostitution; sexual harassment; self-mutilation; spouse swapping or group sex orgies; adultery that is recent, frequent and likely to continue and has adverse effect in the work place; conduct determined to be criminal in the locale in which it occurred; and deviant or perverted sexual behavior which may indicate a mental or personality disorder (e.g., transsexualism, transvestism, exhibitionism, incest, child molestation, voyeurism, bestiality, or sodomy). 32 C.F.R. pt. 154, app. H. The disqualifying factors also include whether such conduct has been recent; whether it increases the applicant's vulnerability to blackmail, coercion or pressure; and whether the applicant is likely to repeat the conduct in the future. *Id.* Mitigating factors include whether the conduct occurred on an isolated basis, the age of the applicant at the time of the act, whether the applicant has completed professional therapy, and whether the sexual misconduct can no longer form the basis for vulnerability to blackmail, coercion or pressure. *Id.*

(d) Knowing membership with.the specific intent of furthering the aims of, or adherence to and active participation in any foreign or domestic organization, association, movement, group or combination of persons (hereafter referred to as organizations) which unlawfully advocates or practices the commission of acts of force or violence to prevent others from exercising their rights under the Constitution or laws of the U.S. or of any State or which seeks to overthrow the Government of the U.S. or any State or subdivision therefor by unlawful means.

(e) Unauthorized disclosure to any person of classified information, or of other information, disclosure of which is prohibited by statute, Executive Order or regulation.

(f) Performing or attempting to perform one's duties, acceptance and active maintenance of dual citizenship, or other acts conducted in a manner which serve or which could be expected to serve the interests of another government in preference to the interests of the United States.

(g) Disregard of public law, statutes, Executive Orders or regulations including violation of security regulations or practices.

(h) Criminal or dishonest conduct.

(i) Acts of omission or commission that indicate poor judgment, unreliability or untrustworthiness.

(j) Any behavior or illness, including any mental condition, which, in the opinion of competent medical authority, may cause a defect in judgment or reliability with due regard to the transient or continuing effect of the illness and the medical findings in such case.

(k) Vulnerability to coercion, influence, or pressure that may cause conduct contrary to the national interest. This may be

(1) The presence of immediate family members or other persons to whom the applicant is bonded by affection or obligation in a nation (or areas under its domination) whose interest may be inimical to those of the United States, or

(2) Any other circumstances that could cause the applicant to be vulnerable.

(*l*) Excessive indebtedness, recurring financial difficulties, or unexplained affluence.

(m) Habitual or episodic use of intoxicants to excess.

(n) Illegal or improper use, possession, transfer, sale or addiction to any controlled or psychoactive substance, narcotic, cannabis or other dangerous drug.

(o) Any knowing and willful falsification, coverup, concealment, misrepresentation, or omission of a material fact from any written or oral statement, document, form or other representation or device used by the Department of Defense or any other Federal agency.

(p) Failing or refusing to answer or to authorize others to answer questions or provide information required by a congressional committee, court, or agency in the course of an official inquiry whenever such answers or information concern relevant and material matters pertinent to an evaluation of the individual's trustworthiness, reliability, and judgment.

(q) Acts of sexual misconduct or perversion indicative of moral turpitude, poor judgment, or lack of regard for the laws of society.

The DIS Manual for Personnel Security Investigations (DIS 20–1–M) establishes operational and investigative policy and procedural guidance for conducting personnel security investigations. *See* DIS 20–1–M (1985). According to the DIS 20–1–M, the DIS will not ordinarily "investigate allegations of heterosexual conduct between consenting adults." *Id.* para. 4–10, at 4–5. If circumstances warrant, the DIS will expand the investigation "to determine if the SUBJECT, through his or her activities is susceptible to coercion and blackmail has committed criminal acts, or engaged in reckless and irresponsible conduct." *Id.* Extramarital sexual relations are considered a legitimate concern when the potential for undue influence or duress exists. *Id.* Other sexual conduct including homosexuality, bestiality, fetishism, exhibitionism, sadism, masochism, transvestism, necrophilia, nymphomania or satyriasis, pedophilia and voyeurism is considered a "relevant consideration in circumstances in which deviant conduct indicates a personality disorder or could result in exposing the individual to direct or indirect blackmail or coercion." *Id.*

"Participation in deviant sexual activities may tend to cast doubt on the individual's morality, emotional or mental stability and may raise questions as to his or her susceptibility to coercion or blackmail." *Id.* para. 4–11, at 4–5, 4–6. At a minimum the investigators are instructed to determine the following:

a. [T]he nature and full extent of deviant acts engaged in, including the period(s) of the SUBJECT's life during which such activity occurred and the frequency and recency of such acts. (The purpose of this inquiry is to determine if the SUBJECT's activities involve actual violation of criminal statutes.)

b. [A] general categorization of the types of individuals with whom the SUBJECT participates in deviant activity. Inquiries should be designed to determine whether the SUBJECT and the coparticipants are open or secretive regarding their deviant activity. Ascertain the general age group of the SUBJECT's partners, since involvement with minors could indicate criminal or irresponsible conduct. Determine if the SUBJECT maintains a single or a small number of lasting relationships or effects numerous transient and temporary liaisons with a variety of individuals through chance meetings in bars or other public places.

c. In what types of places does the SUBJECT generally meet deviant partners, and where does he or she engage in deviant activities? (The purpose of this inquiry is to determine if the SUBJECT's behavior is conducted discreetly or in public places where there would be a greater risk of arrest or disclosure.)

d. Are the SUBJECT's family, friends, and professional associates aware of his or her deviant activity? Also, determine if the SUBJECT knows whether his or her partners have disclosed their deviant proclivities to friends, family, associates, and the like. (The SUBJECT could be susceptible to both direct threats of blackmail and threats directed toward partners.) When information from any source indicates that the SUBJECT is or has engaged in deviant activities, the investigation will be expanded to develop full particulars of such conduct, its influence on the SUBJECT's habits and behavior, and the identity of coparticipants.... [I]t may be beneficial to conduct ... limited inquiries on identified coparticipants, references, and other associates to fully determine the SUBJECT's involvement in such activities. As indicated in the preceding paragraph, utmost care should be taken during the conduct of these investigations because of their sensitivity and controversial nature.

*Id.*

While DIS will expand an investigation with a heterosexual if circumstances warrant, it is undisputed that for both Secret and Top Secret clearances, DISCO refers all homosexual applicants to DISCR for an expanded investigation and adjudication. However, the DIS 20–1–M states that

[m]atters pertaining to sex are not in themselves relevant to a security determination, unless they are indicative of irresponsibility, are criminal, in nature, or create a situation making the SUBJECT vulnerable to blackmail. A SUBJECT will not be asked specific questions about sex unless: (a) the SUBJECT introduces the matter or it has been developed through other sources ... or prior investigation; and (b) questioning is necessary to determine the SUBJECT'S susceptibility to pressure or blackmail, or to explore criminality or irresponsible behavior.

*Id.*, para. 5–27, at 5–25.

### B.

The plaintiffs brought this action in district court claiming

> that DISCO's policy and practice of refusing to grant industrial security clearances to Gay persons because of their sexual orientation, private practice thereof with consenting adults, and related social and political activities, including membership in Gay organizations, and of subjecting them to unjustifiable and time-consuming investigations because of their sexual orientation and related matters violates their Constitutional rights to freedom of speech and association and to equal protection and due process of law.

Third Amended Complaint, at 14.

The suit proceeded as a class action in the district court with three individually named plaintiffs: Timothy Dooling, Joel Crawford and Robert Weston.

Plaintiff Dooling is a homosexual who applied for a Secret industrial clearance on May 2, 1983. On March 22, 1984, DISCO issued a memorandum recommending that Dooling be considered ineligible for a security clearance and forwarded the case to DISCR. DISCR eventually granted Dooling a Secret clearance in May 1984.

Plaintiff Crawford is a homosexual who applied for Secret clearance in December 1981. After DISCO recommended that Crawford be considered ineligible for a Secret clearance, DISCR denied Crawford's application for a Secret clearance based on evidence of past drug abuse.

Plaintiff Weston, a homosexual, has a Secret clearance and in 1984 submitted an application for Top Secret clearance as required for his job at Lockheed Missiles & Space Co. Lockheed never forwarded his application to the DoD because his application revealed he belonged to a gay organization.[5]

The plaintiffs sought an order: declaring unconstitutional and enjoining the DISCO policy of refusing to grant Secret clearances to gay people who have participated in homosexual activity within the past fifteen years and requiring that applications of gay people be forwarded to DISCR for adjudication; declaring unconstitutional and enjoining the DIS practice of subjecting gay applicants to in-depth and time-consuming investigations (required by DIS Manual for Personnel Security Investigations); declaring unconstitutional the five reasons DISCO used to recommend denial of plaintiff Dooling's clearance; and declaring unconstitutional DISCR's processing of plaintiff Crawford's application subsequent to the filing of this lawsuit.

The plaintiffs and the DoD each moved for summary judgment and upon considering the cross-motions, the district court denied the DoD's motion for summary judgment and granted the plaintiffs' motion.

The DoD then filed a motion for reconsideration and a motion for a stay pending appeal. The motion for reconsideration was based on new evidence from several sources indicating that hostile intelligence agencies target persons who are especially vulnerable, and that among others, persons who are homosexuals are considered vulnerable by these agencies. The district

---

**5.** The DoD guidelines at the time instructed companies not to submit Top Secret applications to the Department absent compelling need if the application contained information—including homosexuality—which would result in lengthy delays. DoD guidelines no longer instruct companies to withhold applications containing information regarding homosexuality. *See Weston v. Lockheed Missiles & Space Co.,* 881 F.2d 814, 815 (9th Cir.1989).

court denied the motion for reconsideration but granted the DoD's motion for a stay pending appeal. The DoD contends that its motion should have been granted and asks that we reverse the district court's grant of the plaintiffs' motion.

## II.

### Standard of Review

■ The grant of summary judgment is reviewed de novo. *No GWEN Alliance of Lane County, Inc. v. Aldridge,* 855 F.2d 1380, 1382 (9th Cir.1988). Summary judgment shall be entered where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

## III.

### Equal Protection

■ "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (quotation omitted).

In *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), the Supreme Court held that while the Equal Protection Clause of the Fourteenth Amendment prohibited states from maintaining racially segregated public schools, *see Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), only the Fifth Amendment, not the Fourteenth, was applicable in the District of Columbia. *Bolling,* 347 U.S. at 499, 74 S.Ct. at 694. The Court noted that the Fifth Amendment "does not contain an equal protection clause as does the Fourteenth Amendment which applies only to the states," and held that racial segregation in the District of Columbia public schools violated the Due Process Clause of the Fifth Amendment. The Court believed that in light of their decision in *Brown* that the Constitution prohibits states from maintaining racially segregated schools, "it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government." *Id.* at 499–500, 74 S.Ct. at 694–95 (footnote omitted). The Court also noted that

> the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive. The "equal protection of the laws" is a more explicit safeguard of prohibited unfairness than "due process of law," and, therefore, we do not imply that the two are always interchangeable phrases. [However], discrimination may be so unjustifiable as to be violative of due process.

*Id.* (footnote omitted).

It is thus clear that there is an equal protection component of the Due Process Clause of the Fifth Amendment which applies to the federal government. *See id. See also United States v. Sperry Corp.,* — U.S. —, 110 S.Ct. 387, 396, 107 L.Ed.2d 290 (1989) (discussing "the equal protection component of the Due Process Clause" in reviewing the constitutionality of a federal statute); *Immigration & Naturalization Serv. v. Pangilinan,* 486 U.S. 875, 108 S.Ct. 2210, 2217, 100 L.Ed.2d 882 (1988) (considering "the possibility of a violation of the equal protection component of the Fifth Amendment's Due Process Clause" in reviewing action by the federal government); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975) (referring to "Fifth Amendment equal protection claims").

In this case, the plaintiffs challenge the validity of the DoD Security Clearance Regulations under the equal protection component of the Fifth Amendment; specifically, that the DoD security clearance regulations discriminate against gay people. In considering such Fifth Amendment claims, the Supreme Court has held:

> While the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is so unjustifiable as

to be violative of due process. This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment.

*Wiesenfeld*, 420 U.S. at 638 n. 2, 95 S.Ct. at 1228 n. 2 (quotations and citations omitted).

It is well established that there are three standards we may apply in reviewing the plaintiffs' equal protection challenge to the DoD Security Clearance Regulations: strict scrutiny, heightened scrutiny, and rational basis review. *See Cleburne*, 473 U.S. at 440–41, 105 S.Ct. at 3254–55. The plaintiffs assert that homosexuality should be added to the list of suspect or quasi-suspect classifications requiring strict or heightened scrutiny. We disagree and hold that the district court erred in applying heightened scrutiny to the regulations at issue and that the proper standard is rational basis review. *Accord Ben–Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed.Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990); *Padula v. Webster*, 822 F.2d 97, 103 (D.C.Cir.1987).

The Supreme Court has ruled that homosexual activity is not a fundamental right protected by substantive due process and that the proper standard of review under the Fifth Amendment is rational basis review. *Bowers v. Hardwick*, 478 U.S. 186, 194–96, 106 S.Ct. 2841, 2846–47, 92 L.Ed.2d 140 (1986). The Court explained that the right to privacy inheres only in family relationships, marriage and procreation, and does not extend to all private sexual conduct between consenting adults. *Id.* at 190–91, 106 S.Ct. at 2843–44. The Court specifically characterized "fundamental liberties" under the Constitution "as those liberties that are deeply rooted in this Nation's history and tradition." *Id.* at 192, 106 S.Ct. at 2844 (quotation omitted). In holding that the Constitution does not con-

fer a fundamental right upon homosexuals to engage in consensual sodomy, the Court stated:

There should be, therefore, great resistance to expand the substantive reach of [the Due Process Clauses of the Fifth and Fourteenth Amendments], particularly if it requires redefining the category of rights deemed to be fundamental. Otherwise, the Judiciary necessarily takes to itself further authority to govern the country without express constitutional authority.

*Id.* at 195, 106 S.Ct. at 2846.

There has been a repudiation of much of the substantive gloss that the Court has placed on the Due Process Clauses of the Fifth and Fourteenth Amendments. *See id.* at 194–95, 106 S.Ct. at 2846. If for federal analysis we must reach equal protection of the Fourteenth Amendment by the Due Process Clause of the Fifth Amendment, *see Bolling*, 347 U.S. at 499, 74 S.Ct. at 694, and if there is no fundamental right to engage in homosexual sodomy under the Due Process Clause of the Fifth Amendment, *see Hardwick*, 478 U.S. at 194, 106 S.Ct. at 2846, it would be incongruous to expand the reach of equal protection to find a fundamental right of homosexual conduct under the equal protection component of the Due Process Clause of the Fifth Amendment. *See Bolling*, 347 U.S. at 500, 74 S.Ct. at 694.

Other circuits are in accord and have held that although the Court in *Hardwick* analyzed the constitutionality of the sodomy statute on a due process rather than equal protection basis, by the *Hardwick* majority holding that the Constitution confers no fundamental right upon homosexuals to engage in sodomy, and because homosexual conduct can thus be criminalized, homosexuals cannot constitute a suspect or quasi-suspect class entitled to greater than rational basis review for equal protection purposes. *See Ben–Shalom*, 881 F.2d at 464–65; *Woodward*, 871 F.2d at 1076; *Padula*, 822 F.2d at 103.[6]

---

**6.** "The Constitution, in light of *Hardwick*, cannot otherwise be rationally applied, lest an unjustified and indefensible inconsistency result." *Ben–Shalom*, 881 F.2d at 464–65. "After *Hardwick* it cannot logically be asserted that discrim-

ination against homosexuals is constitutionally infirm." *Woodward*, 871 F.2d at 1076. "It would be quite anomalous, on its face, to declare status defined by conduct that states may constitutionally criminalize as deserving of

This court first considered equal protection and governmental classifications based on homosexuality in *Hatheway v. Secretary of Army*, 641 F.2d 1376 (9th Cir.), *cert. denied*, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981). In *Hatheway*, an Army lieutenant challenged his court-martial conviction for sodomy under Article 125 of the Uniform Code of Military Justice (U.C.M.J.), which makes it a crime for a service person to engage in "unnatural carnal copulation with another person of the same or opposite sex." *Id.* at 1378 (quoting U.C.M.J., 10 U.S.C. § 925 (1976)). Hatheway contended that the convening authority prosecuted only homosexual sodomy cases, would not prosecute any cases involving heterosexual sodomy, and thus violated his constitutional rights. *Id.*

We understood Hatheway's claim to be an equal protection argument, but did not reach the question whether homosexuals were a suspect or quasi-suspect class. *Id.* at 1382 n. 6. However, we noted that

"heightened scrutiny is independently required where a classification penalizes the exercise of a fundamental right," *id.* at 1382 n. 6 (citation omitted), and we applied an intermediate level of review based upon "the similarity of the interests at stake" in *Hatheway* and an earlier Fifth Amendment substantive due process case, *Beller v. Middendorf*, 632 F.2d 788 (9th Cir.1980).[7] *Hatheway*, 641 F.2d at 1382.

*Beller* has since been overruled by *Hardwick*. Because *Beller* is no longer good law, *Hatheway*'s holding that homosexual conduct is a protected fundamental right for equal protection purposes is no longer valid.[8] Neither *Beller* nor *Hatheway* is binding authority on us regarding heightened scrutiny for classifications based on homosexuality. Further, the majority in our recent *Watkins* en banc case did not rule that homosexuality is subject to heightened scrutiny. *See Watkins v. United States Army*, 875 F.2d 699, 705 (9th

---

strict [or heightened] scrutiny under the equal protection clause.... If the Court was unwilling to object to state laws that criminalize the behavior that defines the class, it is hardly open to a lower court to conclude that state sponsored discrimination against the class is invidious. After all, there can hardly be more palpable discrimination against a class than making conduct that defines the class criminal." *Padula*, 822 F.2d at 103 (citations omitted).

7. In *Beller*, in deciding whether the Navy's regulations, which provided for discharge of persons in the service engaging in homosexual activities, violated the substantive due process guarantees of the Fifth Amendment, we stated that the case was "somewhere between" the lowest tier of equal protection scrutiny—a rational relation to a legitimate government interest—and where the government seriously intrudes into matters which deserve due process protection. *Beller*, 632 F.2d at 808–09. We stated that in light of the authorities reviewed (at that time), the reasons which led the Supreme Court to protect certain private decisions intimately linked with one's personality suggest that some kind of government regulation of private consensual homosexual behavior may face substantial constitutional challenge. We further noted that certain cases may require resolution of whether there is a right to engage in consensual homosexual behavior, but that in the instant case (*Beller*) involving a military regulation which prohibited homosexual conduct of persons in the service, "the importance of the government interests furthered, and to some extent the rela-

tive impracticality at this time of achieving the Government's goals by regulations which turn more precisely on the facts of an individual case, outweigh whatever heightened solicitude is appropriate for consensual private homosexual conduct." *Id.* at 810.

8. After *Hardwick* was decided, we were presented with an equal protection challenge to the CIA's policy of allegedly discriminating against homosexuals in making security clearance determinations. *Dubbs v. Central Intelligence Agency*, 866 F.2d 1114 (9th Cir.1989). The plaintiff in *Dubbs* alleged that the CIA had violated her constitutional rights by 1) enforcing a policy of refusing security clearances to all homosexuals and 2) considering homosexual conduct, but not heterosexual conduct, a negative factor in individual security clearance determinations. With regard to plaintiff's first claim, we expressed no opinion on the constitutionality of the CIA's alleged blanket policy against homosexuals. *Id.* at 1119. Further, since this case involves no allegation of a blanket policy of refusing to issue security clearances to homosexuals, *Dubbs'* resolution of this first claim is not relevant to this case. With regard to plaintiff's second claim, we reversed the district court's grant of summary judgment to the defendant because the district court had improperly refused to consider the merits of plaintiff's constitutional claim. *Id.* at 1119–20. However, we did not address the merits of plaintiff's constitutional challenge nor did we express an opinion on the applicable level of scrutiny. *Id.* Thus, *Dubbs* does not affect the outcome of this case.

Cir.1989) (en banc) (*Watkins II*).[9]

There is further support for our holding that homosexuals are not a suspect or quasi-suspect class as specifically applied to the plaintiffs' challenge to the DoD Security Clearance Regulations.

> The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate [governmental] interest....
>
> The general rule gives way, however, when a statute classifies by race, alienage, or national origin.... [B]ecause such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny....
>
> [C]lassifications based on gender also call for heightened standard of review [as do classifications based on] illegitimacy.

*Cleburne*, 473 U.S. at 440–41, 105 S.Ct. at 3254 (quotation omitted).

It is apparent that while the Supreme Court has identified that legislative classifications based on race, alienage, or national origin are subject to strict scrutiny and that classifications based upon gender or illegitimacy call for a heightened standard, the Court has never held homosexuality to a heightened standard of review.

To be a "suspect" or "quasi-suspect" class, homosexuals must 1) have suffered a history of discrimination; 2) exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group; and 3) show that they are a minority or politically powerless, or alternatively show that the statutory classification at issue burdens a fundamental right. *Bowen v. Gilliard*, 483 U.S. 587, 602–03, 107 S.Ct. 3008, 3018, 97 L.Ed.2d 485 (1987) (due to a lack of these characteristics, the statutory classifications of the Federal Aid to Families with Dependent Children Program were subject to only a rational basis review) (citing *Lyng v. Castillo*, 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986) (due to a lack of these characteristics, the statutory classifications of the Federal Food Stamp Program were subject to only a rational basis review)).

While we do agree that homosexuals have suffered a history of discrimination, we do not believe that they meet the other criteria. Homosexuality is not an immutable characteristic; it is behavioral and hence is fundamentally different from traits such as race, gender, or alienage, which define already existing suspect and quasi-suspect classes. *Accord Woodward*, 871 F.2d at 1076. The behavior or conduct

9. In *Watkins II*, the majority specifically declined to reach the constitutional equal protection issues concerning homosexuality raised by the panel opinion. *Watkins II*, 875 F.2d at 705. We instead relied upon equitable estoppel, holding that the Army was estopped from refusing to reenlist Watkins on the basis of his homosexuality. *Id.* at 711.

Judge Norris' concurrence in *Watkins II*, joined by Judge Canby, expresses the opinion that homosexuals constitute a suspect class, arguing that the *Hardwick* Court's concerns about substantive due process have little or no relevance to equal protection doctrine. *See id.* at 716–28 (Norris, J. concurring). We disagree.

As discussed in the main text of this case, under *Bolling* the equal protection guarantees of the Fourteenth Amendment are applied to federal statutes, regulations, and actions through the Fifth Amendment's Due Process Clause. *Bolling*, 347 U.S. at 499, 74 S.Ct. at 694. The two are thus intertwined for purposes of equal protection analyses of federal action.

This is perhaps no more clearly seen than in *Schlesinger v. Ballard*, 419 U.S. 498, 505–07, 95

S.Ct. 572, 576–77 42 L.Ed.2d 610 (1975), in which the Supreme Court, in considering a Fifth Amendment due process challenge, compared *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (federal military gender-based classification based solely upon considerations of administrative convenience violates Fifth Amendment Due Process Clause) and *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (state gender-based classification based solely upon considerations of administrative convenience violates Fourteenth Amendment's Equal Protection Clause), and found that "both ... were premised on overbroad generalizations that could not be tolerated under the Constitution." *Schlesinger*, 419 U.S. at 507, 95 S.Ct. at 577.

The *Watkins II* concurring opinion's conclusion that homosexuals constitute a suspect class is also based in part on an analysis distinguishing *Hardwick* as a "conduct" rather than an "orientation" case. However, this differentiation is not relevant to this case, as the DoD regulations challenged by the plaintiffs all relate to conduct. *See* DIS 20–1–M (1985).

of such already recognized classes is irrelevant to their identification. *Id.*

Moreover, legislatures have addressed and continue to address the discrimination suffered by homosexuals on account of their sexual orientation through the passage of anti-discrimination legislation.[10] Thus, homosexuals are not without political power; they have the ability to and do "attract the attention of the lawmakers," as evidenced by such legislation. *See Cleburne,* 473 U.S. at 445, 105 S.Ct. at 3257. *Accord Ben–Shalom,* 881 F.2d at 466. Lastly, as previously noted, homosexual conduct is not a fundamental right. *Hardwick,* 478 U.S. at 194, 106 S.Ct. at 2846.

Our review compels us to agree with the other circuits that have ruled on this issue and to hold that homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny under the equal protection component of the Due Process Clause of the Fifth Amendment.

Because the district court erred in granting the plaintiffs' motion for summary judgment by applying heightened scrutiny in its equal protection analysis, we now review the plaintiffs' and defendants' cross-motions for summary judgment applying rational basis scrutiny.[11]

## IV.

*Cross–Motions for Summary Judgment*

### A.

The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). If the moving party satisfies this burden, the opponent must set forth specific facts showing that there remains a genuine issue for trial. Fed.R.Civ.P. 56(e). However, no defense to an insufficient showing is required.

*Great Hawaiian Fin. Corp. v. Aiu,* 863 F.2d 617, 619 (9th Cir.1988) (per curiam).

■ If the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy its burden of production under Rule 56 by submitting affirmative evidence that negates an essential element of the nonmoving party's claim or by demonstrating to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting, agreeing with the majority).

■ We view the materials on file in the light most favorable to the nonmoving party. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986). "This is true even though the court was presented with cross-motions for summary judgment; each movant has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor." *Barhold v. Rodriguez,* 863 F.2d 233, 236 (2d Cir.1988) (citation omitted).

**10.** For example: Wisconsin has a comprehensive statute barring employment discrimination on the basis of sexual orientation, Wis.Stat.Ann. §§ 111.31–.395 (West 1988); California has barred violence against persons or property based on sexual orientation, Cal.Civ.Code § 51.7 (West 1984); and Michigan has barred the denial of care in health facilities on the basis of sexual orientation), Mich.Comp.Laws Ann. § 333.20201(2)(a) (West 1984). Executive Orders in other states prohibit such discrimination. *See e.g.,* N.Y.Comp.Codes R. & Regs. tit. 4, § 28 (1983) (barring discrimination in state employment or in the provision of state services and benefits on the basis of sexual orientation). Many cities and counties have also enacted anti-discrimination regulations, including New York, Los Angeles, Chicago, Washington D.C., Atlanta, Boston, Philadelphia, Seattle, and San Francisco. Developments in the Law, *Sexual Orientation and the Law,* 102 Harv.L.Rev. 1509, 1667–68, n. 49–51 (citations omitted).

**11.** We recognize that the denial of DoD's motion for summary judgment is not a final decision of the district court and thus, under normal circumstances, would not be appealable. However, because we have jurisdiction to decide DoD's appeal from the granting of plaintiffs' motion for summary judgment, we exercise our discretion to decide their claim of error in the denial of their summary judgment motion as well. *See Barhold v. Rodriguez,* 863 F.2d 233, 237 (2nd Cir.1988).

The DoD contends that the district court improperly granted the plaintiffs' motion for summary judgment. We agree. The plaintiffs' affidavits and evidence fail to make a sufficient showing that the DoD does not have a rational basis for its expanded security investigation of homosexuals or that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Nor have the plaintiffs offered "any significant probative evidence tending to support [their] complaint." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 254 (quotation omitted).

The plaintiffs first point to the inability of the DoD to find any evidence tending to show that homosexual applicants for clearances have "succumbed to blackmail," "failed to safeguard classified information," or that as a class are a "worse security risk" than heterosexual applicants. Plaintiffs' Brief Supporting Motion for Summary Judgment at 3.

Under a rational basis review as promulgated by the Supreme Court in *Cleburne*, the DoD is not required to conclusively establish that homosexuals have transmitted classified information for its policy of subjecting homosexual applicants to expanded investigations to be constitutional. The DoD need only show a rational basis for its policy and that its policy is rationally related to the legitimate governmental interest of protecting classified material for it to be constitutional. *Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254.

Next, the plaintiffs suggest that other "governmental evidence" conclusively demonstrates that homosexuals do not pose a security risk. Relying on the April 1985 hearings before the Senate Permanent Subcommittee on Investigations, the plaintiffs point out that of forty espionage cases, only two involved homosexuals, neither of which involved a blackmail attempt. Plaintiffs' Brief Supporting Motion for Summary Judgment at 6.

The report the plaintiffs refer to consists of unclassified summaries of a limited number of espionage cases involving individuals who have been convicted of compromising United States classified information. *Fed-eral Government Security Programs, 1985: Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs*, 99th Cong., 1st Sess. 99–166 (1985) (DIA report). Although these case studies involve actual circumstances where DoD and DoD-related classified information was compromised, the report is not a study of all the significant espionage cases involving homosexuals. Moreover, one of the reported cases points out that homosexuals are targeted by the KGB:

[He] was a homosexual and this fact interested the KGB handlers since the homosexual frequently is shunted by society and made to feel like a social outcast. Such a personality may seek to retaliate against a society that has placed him in this unenviable position. [He] was such a person and one of his first assignments on behalf of Soviet Intelligence was to spot other homosexuals in the American Community.

*Id.* at 916.

The plaintiffs' next contention is that their "factual study," illustrating that only two of the nineteen homosexual applicants for security clearance subjected to the expanded investigations were denied security clearances, conclusively establishes that homosexuals who limit their sexual activity to consenting adults in private are a good security risk. Plaintiffs' Brief Supporting Motion for Summary Judgment at 6–7. This contention is meritless. The plaintiffs' "factual study" of nineteen applications is not a large enough sample of homosexual applicants for security clearances to be able to draw such a broad conclusion. Even if the plaintiffs' contention had merit, it would take an expanded investigation of all homosexual applicants to determine which ones limit their sexual activities to consenting adults.

The plaintiffs' last contention is that the DoD "is more concerned with punishing homosexual clearance applicants than with treating them rationally regarding blackmail." Plaintiffs' Brief Supporting Motion for Summary Judgment at 9. In support, the plaintiffs rely on the deposition of Rich-

ard Olinger, former Manager of the Government Security Department at Lockheed Missiles and Space Company, in which Mr. Olinger responded to questions about the subject matter of two conferences he attended during his tenure with Lockheed. According to the plaintiffs, since homosexuality was not discussed at these two conferences on industrial security programs, the DoD has no "real" concern about homosexuals as security risks.

The plaintiffs' conclusion is without merit. A review of the deposition reveals that one of the conferences attended by Mr. Olinger concerned a specific espionage case and the other conference involved a discussion of statistical matters on processing security clearances. Deposition of Robert Olinger at 34 and 47. Given the limited agenda of these two conferences, it is apparent that the security risk of homosexuals would not be discussed.

We are convinced the DoD has met its burden of persuasion under *Celotex* by demonstrating that its investigatory policies and procedures for homosexuals are rationally related to permissible ends, and that the plaintiffs have failed to submit affirmative evidence to negate DoD's evidence. The DoD's justification for their policy of subjecting homosexual applicants to expanded investigations involves a two-step analyses: First, the DoD sought to establish that counterintelligence agencies target homosexuals; and, second, because homosexuals are targeted, the DoD subjects a homosexual applicant to an expanded investigation to determine if the applicant is susceptible to coercion or blackmail or otherwise vulnerable to counterintelligence efforts.

To establish that homosexuals are targeted by counterintelligence agencies, the DoD presented the following evidence. John Donnelly, Assistant Deputy Under Secretary of Defense for Counterintelligence and Security, who is directly responsible for ensuring that the Department's personnel security program remains responsive to the threats posed by hostile intelligence agencies, concluded that the recruitment of individuals by hostile intelligence agencies often involves the "exploitation of what those agencies consider to be human weaknesses, indiscretions and vices," and that with great consistency sexuality is considered a "potentially exploitable vulnerability." He states that hostile intelligence agencies attempt to segregate those with alcohol or drug problems, financial problems, a known disregard for security, and/or those who can be exploited sexually; and that although blackmail may sometimes be used after the person is already compromised, "generally the initial efforts of exploitation centers around enticing the targeted individual with money, sexual favors, treatment for alcoholism, etc." While he notes that this does not mean that hostile intelligence agencies always seek out homosexuals as targets, they usually spot individuals with the desired access and then assess them in order to determine the most effective approach. John Donnelly's Declaration in Support of DoD's Motion for New Trial (Reconsideration) at 3.

Major Francis R. Short, USMC, Judge Advocate in the United States Marine Corps, who served as assistant trial counsel in the court-martial of Sergeant Clayton J. Lonetree, a marine convicted of espionage, stated that at the trial of Sergeant Lonetree, the court accepted Mr. John Barron of Annandale, Virginia as an expert[12] in the field of the methods and operations of the Soviet Intelligence Service (the KGB), and that Mr. Barron testified as to KGB recruitment of homosexuals. Major Francis R. Short's Declaration in Support of DoD's Motion for New Trial.

Mr. Barron's testimony addressed the area of homosexuality on two occasions. While discussing the characteristics the

---

**12.** Mr. Barron's qualifications are listed to include (1) considerable research in the field of KGB organization and operations, (2) the conducting of debriefings of senior members of the KGB upon their defection to the West, (3) the publication of several volumes dealing specifically with the KGB, and (4) his delivery of lectures on the subject of the KGB to professional intelligence officers of both the United States and its allies.

KGB looks for in identifying potential targets for recruitment, he testified:

> [T]he KGB will attempt to identify those who are ideologically sympathetic, experiencing career difficulties, unsuccessful in social relationships, or experiencing problems with narcotics, alcohol, homosexuality, or marital difficulties ... no one trait may be sufficient, and ... the KGB is encouraged when these traits are found in combination.

Major Short Declaration at 1–2 (emphasis added). Barron also specifically cited an example of just such an entrapment operation, in which the KGB entrapped a Canadian ambassador to the Soviet Union through the exploitation of a homosexual relationship. The DoD also relies on Barron's book, *KGB: The Secret Work of Soviet Secret Agents* (1974), which states that "the KGB is not primarily interested in homosexuals because of their presumed susceptibility to blackmail. In its judgment, homosexuality often is accompanied by personality disorders that make the victim potentially unstable and vulnerable to adroit manipulation." *Id.* at 280.

The DoD also presented extracts of sworn statements of Sergeant Lonetree, provided by Lonetree to Special Agents of the Naval Investigative Service, relating one meeting with his Soviet control Sasha (later identified as Aleksei Yefimou, an officer of the KGB), where Sasha specifically inquired as to homosexuals:

> During a meeting with Sasha he asked me to tell him who were the homosexuals, drunks and people who were exploitable who worked in the embassy as civilians. He also asked for other Marines ... who might be queers, dopers or drunks.

Statement of Sgt. Lonetree, Dec. 29, 1986 (emphasis added). On at least one other occasion, "Sasha also wanted to know what marines had problems with alcohol or drugs *or those who were homosexual.*" Statement of Sgt. Lonetree, Dec. 28, 1986, attachment to Major Short Declaration (emphasis added).

Finally, the DoD relies on both plaintiff Dooling's admission that on one occasion

someone attempted to blackmail him because of his sexual orientation, and Richard E. Fay, who described the 1979 Madsen espionage case involving the compromise of classified information by a homosexual. Dooling's Declaration in Support of Plaintiffs' Reply Brief on Motion to Certify Class; Fay Declaration in Support of DoD's Motion for Summary Judgment.

### B.

The DoD has determined what groups are targeted by hostile intelligence efforts. If an applicant falls within a targeted group—like homosexuals—the DoD subjects the applicant to an expanded investigation. The expanded investigation determines whether the applicant is susceptible to coercion or otherwise vulnerable to hostile intelligence efforts. *See Padula,* 822 F.2d at 104 ("criminalization of homosexual conduct coupled with the general public opprobrium toward homosexuality, [subjects] even 'open' homosexuals, to the risk of possible blackmail to protect their partners, if not themselves"); and *McKeand v. Laird,* 490 F.2d 1262 (9th Cir.1973) (examiner found that McKeand feared disclosure of his homosexuality, thus a target for coercion).

Special deference must be given by the court to the Executive Branch when adjudicating matters involving their decisions on protecting classified information:

> Predictive judgment of this kind must be made by those with the necessary expertise.... [T]he protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it.... [C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.

*Department of Navy v. Egan,* 484 U.S. 518, 108 S.Ct. 818, 825, 98 L.Ed.2d 918 (1988).

No one has the "right" to a security clearance. *Id.* 108 S.Ct. at 824. We recognize that "[t]he attempt to define not only

the individual's future actions, but those of outside and unknown influences renders the 'grant or denial of security clearance ... an inexact science at best.'" *Id.* at 825 (quoting *Adams v. Laird,* 420 F.2d 230, 239 (D.C.Cir.1969), *cert. denied,* 397 U.S. 1039, 90 S.Ct. 1360, 25 L.Ed.2d 650 (1970)). Inexact science or not the DoD has articulated a rational relationship between their policy of subjecting homosexual applicants to expanded investigations and its compelling interest in national security.[13] *Id.* 108 S.Ct. at 825 ("an agency head who must bear the responsibility for the protection of classified information committed to his custody should have the final say in deciding whether to repose his trust in an employee who has access to such information") (quotation omitted).

Since the DoD has met its initial burden of production, by negating an essential element of the plaintiffs' claim, the burden of production shifted to the plaintiffs to "produce evidentiary materials that demonstrate the existence of a 'genuine issue' for trial." *Celotex,* 477 U.S. at 331, 106 S.Ct. at 2557 (Brennan, J., dissenting). Thus, it was up to the plaintiffs to meet the issue that the expanded investigations were not, in fact, rationally related to national security concerns.

We conclude that the plaintiffs' affidavits do not raise genuine issues as to any fact material to the alleged constitutional violation, but merely raise an issue as to the alleged irrationality of the KGB's opinion on homosexual behavior. The plaintiffs' evidence is not material to the DoD's basis for expanded investigations of homosexual applicants—that homosexuals are targeted by counterintelligence agencies. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (only disputes over the outcome of the

suit under the governing law will properly preclude entry of summary judgment).

For example, the plaintiffs rely on a resolution of the American Psychological Association which states that homosexuality "implies no impairment in judgment, stability, reliability or general social or vocational capabilities." Resolution of American Psychological Association (January 1975). According to the plaintiffs, the "KGB's obsolete opinions on homosexual behavior" should be rejected in favor of adopting the position of the American Psychological Association. However, the counterintelligence agencies' reasons for targeting homosexuals—even if based on continuing ignorance or prejudice—are irrelevant. *Cf. Beller,* 632 F.2d at 811.[14] If hostile intelligence efforts are directed at homosexuals, the DoD must be assured that because of the targeting, the individual will not compromise national secrets.

The Preliminary Joint Staff Study on Protection of National Secrets (October 25, 1985) relied upon by the plaintiffs also fails to raise a genuine issue for trial. The paper outlines an alternative approach to the current national security procedures and does not discuss the current operations of hostile intelligence efforts.

Accordingly, the district court erred in denying the DoD's motion for summary judgment.

### V.

### A.

*First Amendment*

■ The plaintiffs next challenge "the five 'reasons' used by DISCO to decline to grant DOOLING and other class members, a clearance—including his membership in HIGH TECH GAYS (Complaint, para. 11)—

---

**13.** The DoD advances other justifications for its policy: a homosexual may be emotionally unstable and homosexual conduct may be criminal. Because we conclude that the targeting of homosexuals by hostile intelligence agencies is a legitimate if not compelling justification for the expanded investigations, we need not address these additional justifications.

**14.** Despite evidence that attitudes toward homosexual conduct have changed among some groups in society, the Navy could conclude that a substantive number of naval personnel have feelings regarding homosexuality based upon moral precepts recognized by many in our society as legitimate, which would create tensions and hostilities, and might undermine the ability of a homosexual to perform supervisory duties. *Beller,* 632 F.2d at 811.

[as] unconstitutional." Plaintiffs' Brief Supporting Motion for Summary Judgment at 2. The plaintiffs specifically alleged:

11. By memorandum dated 22 March 1984, Defendant DIRECTOR OF DISCO refused to grant DOOLING a Secret clearance and referred the matter to DISCR with a recommandation (sic) that he be considered ineligible for a security clearance. Only the following "reasons" were stated: (a) he disclosed that he visits Gay bathhouses; (b) he disclosed that he belongs to a Gay organization; (c) he disclosed that he has homosexual activity with casual acquaintances; (d) he intend[ed] to inform his employer of his homosexuality; and (e) he intend[ed] to continue his homosexual lifestyle in the future.... [T]his information constituted the *sole* basis for DISCO's refusal to grant him a clearance. (DISCR then reviewed the matter and granted the clearance in May 1984 without further investigation or other proceedings.)

12. DISCO treats all Gay persons as it treated DOOLING ... because of their Gay sexual orientation, the private practice thereof with consenting adults, and related social and political activities....

.    .    .    .    .

17. Plaintiff[ ] DOOLING ... and other class members have suffered and will continue to suffer violations of their Constitutional rights of freedom of speech and association (Amendment One) ... by DISCO's use of such "reasons" as those stated specifically in Paragraph 11, above, and generally in Paragraph 12, above, for refusing to grant security clearances to Gay applicants.

Third Amended Complaint, para. 11–12, 17, at 7–12.

The above allegations refer to a March 22, 1984, letter from G.M. Crane, the Director of DISCO, to DISCR regarding plaintiff Dooling's application for a Secret clearance. The letter provides, in pertinent part:

Based upon *information contained in the attached case file,* recommend that SUBJECT [Dooling] be considered ineligible for a security clearance within the Defense Industrial Security Program because it is not considered to be clearly consistent with the national interest.

1. Adjudicative Criterion Considered (DoD 5220.6; DoD 5200.2–R): H (pattern of sexual perversion). SUBJECT disclosed that he visits gay bathhouses, belongs to a gay organization and has homosexual activity with casual acquaintances. SUBJECT claims that he intends to inform his employer of his homosexuality and stated that he intends to continue his homosexual lifestyle in the future.

2. Investigative Data: Expanded National Agency Check, March 12, 1984, 83357–DS6–3587–1V9.

(Emphasis added).[15]

Based upon our equal protection analysis above, DISCO's recommendation of denial of Dooling's application and its referral to DISCR for an expanded investigation and adjudication was in accordance with the regulations and did not violate constitutional guarantees. His disclosures regarding his visits to gay bathhouses, his membership in a homosexual organization, his homosexual activities with casual acquaintances, his intention to inform his employer as to his homosexuality, and his intention to continue his homosexual lifestyle in the future were sufficient to justify the referral of the application to DISCR for an expanded investigation. His membership in a homosexual organization was simply one of the many facets of the criteria being considered as part of Dooling's homosexual activities. Therefore, the plaintiffs' claim that consideration of these five criteria is unconstitutional must fail.

The district court erred in finding that "DISCO's use of mere membership in a 'gay organization' to refuse to grant a clearance violates plaintiffs' first amendment rights," that "defendants simply use membership in a 'gay organization' to re-

15. As noted above and admitted in plaintiffs' complaint above, DISCR granted Dooling's clearance in May 1984 without further investigation or other proceedings. *See* Third Amended Complaint, para. 11, at 7.

quire additional investigation," and that "[s]uch policy clearly violates the first amendment." *High Tech Gays*, 668 F.Supp. at 1378. DISCO's recommendation to DISCR is specific to Dooling, and the reasons given are specific to his homosexual activities and to the listed adjudicative criterion. The DISCO memorandum simply recommends ineligibility to DISCR because of a certain "pattern of sexual perversion" that includes various homosexual attributes, one of which was his membership in a gay organization.

The plaintiffs did not allege in their complaint or their motion papers, nor does this record show, that any gay person has been denied a security clearance or has been subjected to an expanded investigation based solely upon membership in a gay organization. The plaintiffs have not shown membership in a gay organization to be a distinct, separate, abstract ground for denying security clearances. Therefore, there is no case or controversy involving a First Amendment constitutional violation before the district court, and we will not create one now.

## B.

### *Plaintiff Crawford*

The plaintiffs next challenge DISCR's processing of plaintiff Crawford's application subsequent to the filing of this lawsuit as unconstitutional. Plaintiffs' Brief Supporting Motion for Summary Judgment at 2. The plaintiffs specifically alleged:

11.1 In October 1984, Defendants subjected Plaintiff CRAWFORD to a personal interview in which the details of his sexual activities and related social activities were probed. In particular, he was asked about the number of his adult male sexual partners, and the information he provided on this subject constituted the *sole* basis for his inability to obtain a Secret clearance until after he joined this lawsuit in February, 1985. In late April 1985, CRAWFORD was notified by a second Statement of Reasons from DISCR that his application was being denied this time because of past, discontinued marijuana use rather than

the purely sexual reasons listed in the first Statement of Reasons issued in about July 1984. The DOD changed its reasons in retaliation for CRAWFORD's joining this lawsuit in a attempt to weaken his legal position herein by shifting its grounds from homosexuality to drug use, in violation of his First Amendment right to petition the Courts for redress of grievances and his right to due process of law in security clearance processing.

Third Amended Complaint, para. 11.1, at 8–9.

The above allegations refer to a June 16, 1983, letter from E. Eric Holt, the Director of DISCO, to DISCR regarding plaintiff Crawford's application for a Secret clearance. The letter provides, in pertinent part:

Based upon *information contained in the attached case file*, recommend that SUBJECT [Crawford] be considered ineligible for a security clearance within the Defense Industrial Security Program because it is not considered to be clearly consistent with the national interest.

1. Adjudicative Criterion Considered (DoD 5220.6; DoD 5200.2–R): H (pattern of sexual perversion), I and J. SUBJECT admitted at least weekly participation in promiscuous homosexual acts and is currently receiving treatment for schizophreniform disorder described as "ongoing".

2. Investigative Data: Expanded National Agency Check completed March 10, 1983, by the Defense Investigative Service (DIS), file number 83035–DR1–33441V1. A current National Agency Check (NAC) has been requested and will be forwarded upon receipt.

(Emphasis added).

Based upon our equal protection analysis above, DISCO's recommendation of denial of Crawford's application, and its referral to DISCR for an expanded investigation and adjudication, was in accordance with the regulations and did not violate constitutional guarantees. His admissions as to his weekly participation in promiscuous homosexual acts and his current receipt of treatment for his "ongoing" schizophreniform disorder were sufficient to justify the referral of the application to DISCR for an

expanded investigation. Therefore, the district court erred in granting summary judgment in favor of plaintiff Crawford "with respect to his claim regarding DISCO's refusal to grant his clearance because of his 'homosexual activity and susceptibility to coercion.'" *High Tech Gays*, 668 F.Supp. at 1379. As we have ruled today, use of these factors alone does *not* violate Crawford's constitutional rights.

## VI.

### *Conclusion*

We reverse the part of the district court's order granting summary judgment to the plaintiffs, vacate the part denying summary judgment to the DoD, and remand to the District Court for the entry of summary judgment in favor of the DoD, and for reversal of the district court's award of attorneys' fees to the plaintiffs.

REVERSED IN PART, VACATED IN PART, and REMANDED.

